Nobe BAKER (Individually and as Administrator of the Estate of Joann Baker), et al., Appellants

v.

MAGNUM HUNTER PRODUCTION, INC., Appellee

2013–SC–000497–DG

Supreme Court of Kentucky.

RENDERED: AUGUST 20, 2015

Rehearing Denied December 17, 2015

Counsel for Appellants: George E. Stigger, III, John C. Whitfield, Madisonville.

Counsel for Appellee: Anne Adams Chesnut, Lexington, Harry Don Callicotte, Radcliff, Richard Clayton Larkin.

Counsel for Amicus Curiae Kentucky Oil and Gas Association, Inc.: Karen J. Greenwell, Lexington, Gregory Brian Wells.

Counsel for Amicus Curiae National Association of Royalty Owners: James Lincoln Hamilton.

## OPINION OF THE COURT BY JUSTICE ABRAMSON

Two sets of Harlan County landowners, the Bakers[1] and certain heirs (together with their spouses) of Chester Jackson (the "Jackson heirs")[2] jointly brought suit in Harlan Circuit Court seeking, among other things, damages and a declaration of their rights under oil and gas leases executed in 2004 with Daugherty Petroleum, Inc. Daugherty is Appellee Magnum

---

1. Nobe Baker and his wife, Joann Baker, now deceased.

2. Colene Jackson Wickline, Lillie Jackson, Lowell Jackson, Geneva Lee Jackson, Jerold Jackson, Virginia L. Jackson, Merle Jackson, Louellen Jackson, Harold Jackson, Sandra Jackson, Carolyn Ruth J. Knuckles, Charles Knuckles, Sue Carol J. Farley, and Anthony Farley. Appellants' brief suggests that Colene Jackson Wickline has been succeeded by Michael Wickline, Janet Wickline, Cassie Wickline, and Kimberly Wickline.

Hunter Production, Inc.'s ("MHP's") predecessor. The landowner-lessors sought a declaration to the effect that the lessee production companies had miscalculated and underpaid royalties due under the leases. Alternatively, they sought a declaration that the leases had expired. The trial court rejected these claims as a matter of law and, under Kentucky Rule of Civil Procedure (CR) 12.02, dismissed the corresponding portions of the landowners' Complaint. The Court of Appeals affirmed, unanimously agreeing with the trial court that given royalty provisions such as those in the leases at issue here, Kentucky law does not embrace the so-called "marketable product" approach to royalty calculation. We granted the landowners' motion for discretionary review to address their contention that the lower courts in this case, as well as a recent spate of federal court decisions on the "marketable product" question, including that of the United States Court of Appeals for the Sixth Circuit in *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235 (6th Cir. 2011),[3] have misconstrued Kentucky law. We reject the landowners' contention and therefore affirm.

### RELEVANT FACTS

The pertinent facts are not in dispute.[4] In May 2004, the Jackson heirs executed an oil and gas lease (the "Jackson Lease") giving Daugherty Production Company the exclusive right to explore for and produce if discovered "oil, gas, casing-head gas, and casing-head gasoline" on some 130 acres situated "on Laurel Fork of the Greasy Fork of the Kentucky River in Harlan County, Kentucky." In October of that year, the Bakers executed a lease (the "Baker Lease") giving the same rights to Daugherty on some sixty acres "situated on waters of Laurel Creek of the Greasy Creek of the Middle Fork of the Kentucky River in Harlan County, Kentucky." Both Leases provide, in pertinent part, that the Lease will remain in effect for a primary term (one year under the Baker Lease and three years under the Jackson Lease), "and as long thereafter as oil, gas, casing-head gas, casing-head gasoline or any of them is produced from said leased premises." In exchange for the Lessee's right to produce and market oil and gas from the leased premises, the Leases provide for royalties. With respect to gas, under both Leases the "Lessee covenants and agrees: ... To pay Lessor one-eighth of the market price at the well for gas sold or for the gas so used from each well off the premises."

Within the Leases' respective primary terms the Lessee completed gas wells on both properties and commenced paying royalties on the gas produced and sold. The raw gas is not suitable for sale at the well (or at least it is not sold there), so prior to sale the Lessee gathers, compresses, and treats the raw gas, and then transports the refined and enhanced product to purchasers elsewhere, "downstream" from the well. From the sale price it ultimately receives for its enhanced gas, the Lessee deducts its gathering, compression, treatment, and transportation costs (as well as

3. *See also, Appalachian Land Co. v. EQT Prod. Co.*, 2012 WL 523749 (E.D. Ky. 2012); *In re KY USA Energy, Inc.*, 448 B.R. 191 (Bankr. W.D. Ky. 2011); *Thacker v. Chesapeake Appalachia*, 695 F.Supp.2d 521 (E.D. Ky. 2010).

4. As the parties note, a motion to dismiss under CR 12.02 for failure to state a claim, should not be granted, as it was here, unless, even assuming that the plaintiffs factual allegations are true, the plaintiff is not entitled to relief as a matter of law. *Fox v. Grayson*, 317 S.W.3d 1 (Ky. 2010). For the purposes of this appeal, therefore, MPH does not dispute the landowners' rendition of the facts, and we review the lower courts' application of law to those facts de novo. *Id.*

some other post-production costs), before calculating the landowners' one-eighth royalty share on the remaining net revenue. For example, according to a September 2011 royalty statement for one of the Jackson heirs, MHP sold its processed and transported natural gas during the accounting period for $4.15 per Mcf (thousand cubic feet), but for royalty purposes MHP deducted from that sale price $3.65 per unit for "transportation" expenses (The statement apparently lumps all of the post-production costs together under that heading.). That "work-back" calculation left $.50 per unit as the market price of the raw gas at the well—the amount upon which the landowners' royalty was to be calculated under the Lease—and resulted in a royalty of $.0625 per unit.

Dissatisfied with what they regarded as an inadequate return on their Leases, the Jackson heirs and the Bakers (whose royalty was similarly determined) brought suit alleging, in part, that the Lease provision basing their royalty on "one-eighth the market price at the well" should be understood to contemplate not a hypothetical sale of raw gas "at the well," but rather the sale of gas made "marketable,"—by accumulating, compressing, and treating, if need be—and then sold "at the well," again hypothetically, by deducting the expenses of transporting the marketable gas to some other point of sale. Thus, the landowners urged that royalty should be calculated by deducting bona fide transportation costs from the sales price received downstream from the well; but any costs otherwise necessary to render the raw gas marketable are the producer's responsibility and cannot be deducted from gross

receipts in the calculation of royalty.[5] This "marketable product" or "first marketable product" approach, the landowners insist, is necessary to give meaning to the Lease's inclusion of the term "*market price* at the well" because, in their view, until a product is marketable it cannot have a market price. Both courts rejected this argument, with the Court of Appeals noting that "market value (price) at the well" is even defined in BLACK'S LAW DICTIONARY ("BLACK'S") as "[t]he value of oil or gas at the place where it is sold, minus the reasonable cost of transporting it *and processing it* to make it marketable." BLACK'S at 1058 (9th ed. 2011) (emphasis supplied).

### *ANALYSIS*

I. **"Market Price at the Well" Has an Established Meaning in Kentucky that Allows for the Deduction of Post–Production Costs Before Calculating Royalty.**

■ According to the landowners, the trial court's and the Court of Appeals' failure to make a distinction between transportation costs and the costs of otherwise making raw gas marketable ("processing costs"), resulted in the same misreading of Kentucky law that has occurred in the federal courts. Specifically, the landowners contend that to give effect to a covenant implicit in oil and gas leases whereby the lessee undertakes not merely to extract the raw mineral, natural gas in this case, but to make a reasonably diligent effort to market it as well, the lessee must bear the full responsibility for all processing costs necessary to achieve a marketable product.[6] Our analysis begins,

---

5. The landowners would limit the lessee's responsibility to producing a "first" marketable product and would allow, once marketability is achieved, a deduction from gross receipts of the costs of further enhancing the product.

6. The landowners derive this implied covenant from the following language in *Warfield Natural Gas Co. v. Allen*, 248 Ky. 646, 59 S.W.2d 534, 536 (1933): "[I]n the absence of specification of duties and obligations intend-

then, with this claim that Kentucky has not heretofore committed itself on the question of the apportionment of post-production costs under "market price at the well" royalty clauses, and that fairness demands a different apportionment of costs under such clauses than that approved by the trial court and the Court of Appeals. Neither aspect of the landowners' claim persuades us that either the trial court or the Court of Appeals was wrong.

Oil and gas leases are contracts, of course, and like other contracts are to be construed as a whole so as to give effect to the parties' intent as expressed in the language they chose. *City of Louisa v. Newland*, 705 S.W.2d 916 (Ky. 1986); *Wilcox v. Wilcox*, 406 S.W.2d 152 (Ky. 1966). Such leases are highly specialized contracts, however, often employing terms and clauses that have been judicially construed. *Levin v. Maw Oil & Gas, LLC*, 290 Kan. 928, 234 P.3d 805 (2010). While courts should be careful not to stymie intended departures from previously construed terms, *id.* absent a clear intent to depart, parties who employ terms that have been judicially construed may be presumed to have intended the established meaning. *Prudential Ins. Co. of America v. Harris*, 254 Ky. 23, 70 S.W.2d 949 (1934); *Zachry Construction Corp. v. Port of Houston Authority*, 449 S.W.3d 98, 112 n.66 (Tex. 2014) ("Contracting parties generally select a judicially construed clause with the intention of adopting the meaning which the courts have given to it." (citation and internal quotation marks omitted)).

Many oil and gas lease terms have acquired judicially recognized meanings. "Royalty" has been defined as "the landowner's share of production, free of expenses of production." *Ramming v. Nat-*

*ural Gas Pipeline Company of America*, 390 F.3d 366, 372 (5th Cir. 2004) (citing *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex. 1996)); *see also* BLACK'S LAW DICTIONARY (9th ed. 2009) ("landowner's royalty. A share of production or revenues provided for the lessor in the royalty clause of the oil-and-gas lease and paid at the well free of any costs of production.") And "production," has been widely understood to mean "the oil, gas, and other minerals that the lessee extracted from the ground at the well-head, where the lessee reduced the minerals to its physical possession." Byron C. Keeling and Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What Is The "Product"?*, 37 St. Mary's L.J. 1, 29 (2005) (collecting cases in footnote 116) ("Keeling and Gillespie"). "Royalty," then, has commonly been understood as the lessor's cost-free share of the raw mineral "produced" at the point of capture (in the case of gas "at the well").

If the gas is not sold at the wellhead, but is refined or processed in some way and moved to a place of sale downstream from the well, in most jurisdictions, "royalty's" entitlement remains its portion of the raw gas initially "produced," so that in calculating "royalty," the lessee may deduct from its downstream receipts any "post-production" costs incurred to market the gas. Randy Sutton, *Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs*, 99 A.L.R.5th 415 (originally published in 2002, updated weekly) (noting that the majority rule is to allow the proportionate allocation of reasonable post-production costs to the lessor). This approach to royalty is often referred to as the "at the well" rule, and the deduction of

---

ed to be assumed, the law will imply an agreement to do and perform those things that according to reason and justice the par-

ties should do in order to carry out the purpose for which the contract was made."

downstream costs to determine an "at the well" value of the natural resource for royalty purposes is often referred to as the "work-back" or "net-back" method. Keeling and Gillespie, 37 St. Mary's L.J., at 31–32.

As the Sixth Circuit Court of Appeals noted in *Poplar Creek*, Kentucky law has long embraced these principles. In *Reed v. Hackworth*, 287 S.W.2d 912, 913 (Ky. 1956), our predecessor Court considered a gas lease that provided the lessor with the standard one-eighth share of production royalty but was "silent as to the place of market and the price of the gas." The lessee contracted to sell the gas to a utility company with the lessee obligated to build a pipeline from the well to the company's facilities in exchange for a loan to finance the pipeline and the company's agreement to purchase the gas eventually piped. The utility company was to pay $.25 per unit for the gas, $.10 of which was understood to be a transportation charge. The royalty owner brought suit seeking a declaration that her royalty was to be based on the full $.25 per unit paid to the lessee.

Reversing a judgment in the royalty owner's favor, the *Reed* Court invoked the common understanding of royalty as a share of raw production, and made the corollary presumption that "where, as here, the lease is silent concerning the place of market and the price, the royalty should be applied to the fair market value of gas at the well." 287 S.W.2d at 913–14. To arrive at that "at the well" value, the Court held that simply deducting the transportation cost from the downstream price of the gas was not unreasonable since the result, $.15 per unit, was consonant with the expert testimony that had been introduced to the effect that comparable sales in the area indicated an "at the well" market value in the neighborhood of $.12 to $.15.

*Reed* relied on two prior cases, *Rains v. Kentucky*, 200 Ky. 480, 255 S.W. 121 (1923) and *Warfield Natural Gas Co. v. Allen*, 261 Ky. 840, 88 S.W.2d 989 (1935). Both involved similar one-eighth-of-gas-produced royalty provisions with the provisions silent as to how or where the production was to be valued. In both cases, the Court held that the presumption with respect to such royalty provisions is that royalty is to be valued "at the well side." As the Court put it in *Warfield*,

Nothing was said in the lease about a sale elsewhere and this lease must be held to mean one-eighth of the gross proceeds of a sale of the gas at the well side, and that is all for which defendant must account even though it may market the gas elsewhere and get a much greater sum for it.

88 S.W.2d at 992.

In *Rains*, the lessee sold the raw gas at the well-side to a pipeline company for $.06 per unit, and the pipeline company then transported the gas to the city of Williamsburg where it was able to resell it for $.42 per unit. The lessor brought suit claiming that he was entitled under the lease, which was silent as to how or where the gas royalty was to be valued, to a one-eighth share of the $.42 per unit sale price in Williamsburg. Rejecting that claim, the Court explained that

While the lessee of a gas well may be under the duty of using reasonable effort to market the gas, we are not inclined to the view that this duty, in the absence of a contract to that effect, is so exacting as to require him to market the gas by obtaining a franchise from some town or city and distributing the gas to the inhabitants thereof. On the contrary, he fully complies with his duty if he sells the gas at a reasonable price at the well side to another who is willing to undergo the risk of expending a large

amount of money for the purpose of distributing the gas to the ultimate consumers. We are therefore constrained to the view that under the contract in question appellant was entitled to either $50.00 a year for each well or to one-eighth of the fair market price of the gas at the well side.

255 S.W. at 122–23.

*Reed, Warfield,* and *Rains* all understand royalty, absent an express contrary provision, as the lessor's cost-free share of production, with "production" understood, in the case of gas, as the raw gas captured at the well. Value "at the well" is thus the default measure of royalty in Kentucky where a lease is silent, and absent some clear indication to the contrary, leases, such as those at issue here, which expressly provide for that very measurement will be understood as intending Kentucky's long-established approach.

■ The Sixth Circuit Court of Appeals thus clearly did not misconstrue our cases when it held in *Poplar Creek* that

Kentucky follows the "at-the-well" rule, which allows for the deduction of post-production costs prior to paying appropriate royalties. We further hold that "at-the-well" refers to gas in its natural state, before the gas has been processed or transported from the well.

636 F.3d at 244. Contrary to the landowners' contentions in this case, this holding accurately states Kentucky law.

Against this result, Baker and the Jackson heirs refer us to an alternative approach to royalty which is developing in a handful of jurisdictions and which has come to be referred to as the "marketable product" or the "first marketable product" approach. Rachel M. Kirk, *Variations in the Marketable–Product Rule From State to State,* 60 Okla. L.R. 769 (2007) (discussing developments in Colorado, Kansas,

Oklahoma, and West Virginia) ("Kirk"). Under this approach, royalty is still thought of as the lessor's cost-free share of production. "Production," however, is understood not simply as the initial capture of the raw mineral, but in light of the lessee's implied duty to market the captured minerals, is instead thought of as extending to the production of a "marketable" product. If marketability requires compressing, processing, or transporting the raw gas, for example, then under the "marketable product" approach those costs, or some of them at least, must be borne by the lessee without contribution from the royalty interest. Kirk at 773–75.

Baker and the Jackson heirs insist that some variation of the marketable product approach is consistent with the cases discussed above, *Reed, Warfield,* and *Rains,* because those cases addressed only transportation costs. Allowing the lessee to deduct transportation costs from its gas sale receipts makes sense under an "at the well" royalty provision, they concede, because those deductions have the effect of returning the sale to the well-side. Other postproduction cost deductions, however, such as the gathering, compression, and treatment cost deductions at issue here, should not be allowed, they insist, to the extent that such expenditures are required to obtain a "marketable" product. They base this contention on the lessee's duty to market and on the royalty clause, which provides that royalty is to be based on the *"market price* at the well." There can be no market price, they contend, until there is a product that can be marketed. We are not persuaded.

As noted already above, Kentucky recognizes, as do all of the major oil and gas producing jurisdictions, Kirk at 774, that "the lessee of a gas well [is] under the duty of using reasonable effort to market the gas." *Rains,* 255 S.W. at 122. *Rains*

and *Reed* (relying on *Rains*) hold, however, that that duty does not extend beyond "sell[ing] the gas at a reasonable price at the well side." *Id.* As also made clear in the cases already cited, the reasonable well-side price may be determined either by an actual well-side sale, *Rains,* by comparable sales in the vicinity, *Warfield,* or by working back from a downstream sale by deducting the downstream costs, *Reed.* See also, *Cumberland Pipe Line Co. v. Commonwealth,* 228 Ky. 453, 15 S.W.2d 280 (1929) (holding that for tax purposes, the market value of crude oil "at the well," could be determined by deducting downstream costs from downstream sale proceeds); Keeling and Gillespie, 30–36 (discussing the work-back method and collecting cases in which it was approved). In other words, our law requires, under this sort of royalty provision, that production be marketed, but once it is, we allow a presumption that it was marketed "at the well," with the value (or proceeds) at that point (arrived at if necessary by applying the work-back method) providing the basis for calculating the royalty. As noted, this result is in line with the majority position, and in particular it comports with the recent rejection of the "first marketable product" approach by two of our sister states. *See Kilmer v. Elexco Land Services, Inc.,* 605 Pa. 413, 990 A.2d 1147 (2010), and *Bice v. Petro–Hunt, L.L.C.,* 768 N.W.2d 496 (N.D. 2009).

These same considerations also answer Baker and the Jackson heirs' contention regarding the royalty clause's use of the words *"market price* at the well." Without more specificity, those words cannot reasonably be construed to require that royalty be based on the actual price for which the processed gas, an enhanced product, was sold less transportation costs, or the first price for which the gas could have been sold less transportation costs. Our law requires rather that, absent clear provision otherwise, royalty be based on the value (or price or proceeds) of the raw gas first produced, a value (or price or amount) that can be determined, if the raw gas was not actually sold, by means of the work-back calculation.

As for the landowners' "fairness" argument, it seems abundantly clear that the market value at the well approach employed by Kentucky and the majority of states is not only long-standing but also fair in every sense. If the landowner's royalty is calculated on the amount received by the lessee downstream minus only transportation costs, the landowner receives *more* than one-eighth of the value of the raw gas produced from his property, *i.e.,* he receives one-eighth of the value of the processed gas, an enhanced product, without having borne any of the costs associated with turning the raw gas into that more valuable product. The "first marketable product" approach, thus, distorts the seven-eighths/one-eighth split of the "market price at the well" for which the parties contracted.

In sum, the use of the phrase "market price at the well" in these Leases invokes our usual "at the well" rule, it does not alter it. The trial court and the Court of Appeals did not err by concluding that Count I of the complaint, alleging improper deductions from royalties under the Baker and Jackson Leases, failed to state a claim.

## II. The Leases Have Not Terminated Under Their Habendum Clauses.

The trial court also dismissed Count IV of the Complaint, wherein the Bakers and the Jackson heirs contended that if the gas produced at the wellhead is not marketable there then the gas is not being produced "in paying quantities" and the Leases have expired. As noted above,

the Leases at issue provide for a fixed primary term, after which they continue in effect only "as long ... as oil, gas, casing-head gas, casing-head gasoline or any of them is produced from said leased premises." Although this habendum clause[7] does not say that any of the named minerals must be produced "in paying quantifies," the landowner-lessors correctly note that production "in paying quantities" is generally deemed implicit in the requirement that the lease be productive. *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex. 2002) ("In Texas, such a habendum clause ['as long thereafter as oil, gas, or other mineral is produced'] requires actual production in paying quantities."); *Tucker v. Hugoton Energy Corp.,* 253 Kan. 373, 855 P.2d 929, 935 (1993) ("Although the phrase 'in paying quantities' may not appear in oil and gas leases, it implicitly is a part of the habendum clause.").

■ In Kentucky, "paying quantities" in this context has been held to mean "such quantities as are susceptible of division between the parties and as will yield a royalty to the lessor that justifies the occupancy of and interference with his use of his lands by the operations." *Warfield Natural Gas Co.,* 59 S.W.2d at 538; *Cumberland Contracting Co. v. Coffey,* 405 S.W.2d 553 (Ky. 1966) (holding that one-and-one-half barrels of oil per week was not "production" as contemplated by the habendum clause). This law would seem to defeat the landowners' claim, because they do not dispute that they are actually being paid royalties on more than a *de minimus* amount of natural gas produced on their land.

In what can only be described as a strained attempt to avoid application of the controlling law, the landowners contend

that if "production" is deemed to cease at the wellhead, as for royalty purposes it does, then "production" is paying nothing, for habendum clause purposes, much less "paying quantities," because the raw gas is not being sold as is at the well and perhaps could not be sold there. Without "paying quantities" under this creative construct, the landowners contend that the Leases have expired under the above-quoted provision which extends their terms only "as long thereafter as ... gas ... is produced from said leased premises." We reject what we regard as a hyper-technical argument contrary to the plain meaning of the Leases.

The habendum clause requires that a sufficient quantity of gas be "produced" to yield, once the gas is marketed in a reasonable manner, a royalty that would justify the operation. The royalty clause implicates "production" in a more technical sense—gas brought to the well—to define the point at which the royalty interest in the gas is to be valued. The two clauses and the two slightly different senses of "production" are not incompatible and they do not suggest in any way that the "at the well" approach to royalty valuation calls the ongoing productiveness of the Leases into question when sales of the gas are not actually occurring at the well-side. Clearly MHP is producing "paying quantities" of gas from the leased premises, giving the landowners no credible argument that the Leases have expired. Again, the trial court and the Court of Appeals did not err by concluding that Count IV of the Complaint failed to state a claim.

### CONCLUSION

In sum, we concur with the Sixth Circuit Court of Appeals' identification of Ken-

---

**7.** A "habendum clause" is the "part of an instrument ... that defines the extent of the interest being granted and any conditions affecting the grant." BLACK's at 778.

tucky as an "at the well" state with respect to gas lease royalty valuation. For the purposes of such valuation under standard "market price (value) at the well" royalty clauses, the lessee is solely responsible for the costs of production—of bringing the gas to the well—but post-production costs for such marketing-related enhancements as accumulating, compressing, processing, and transporting the gas may be deducted from gross receipts before the calculation of the royalty share. The Leases at issue, by employing the term "market price at the well," explicitly reflect this method of royalty valuation. Further, the record reflects that "paying quantities" are being produced from the leased premises, refuting any suggestion that the Leases have expired pursuant to their habendum clauses. Accordingly, we affirm the Opinion of the Court of Appeals.

All sitting. All concur.