**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0286n.06

Case No. 19-3942

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DALE H. HENCEROTH; MARILYN S. WENDT, | ) ) ) ) | **FILED**<br>May 21, 2020<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | |
| MELINDA J. HENCEROTH, et al. | ) ) | |
| Plaintiffs | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| CHESAPEAKE EXPLORATION, LLC, | ) ) | |
| Defendant-Appellee. | ) | |

BEFORE: BATCHELDER, GIBBONS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Chesapeake Exploration extracts oil and gas from the Utica Shale and other formations in eastern Ohio. A class of plaintiffs with land over the formations claims that the company short-changed them on royalties. The district court rejected their claims, and so must we.

I.

Over a decade ago, hundreds of landowners signed leases granting Anschutz Exploration rights to the oil and gas beneath their property. In exchange, Anschutz agreed to give the landowners one-eighth of the proceeds it received from oil and gas sales as a royalty.

Chesapeake Exploration purchased these leases and assumed the extraction rights and royalty obligations under them. Its parent company, Chesapeake Energy, divides its work between two subsidiaries. Chesapeake Exploration is the lessee under the contracts. It operates the wells that extract the oil and gas. Chesapeake Exploration then sells the oil and gas to an affiliate, Chesapeake Marketing, which prepares the product for sale. That costs money—above all the costs of transporting the oil and gas to the relevant pipelines. Once downstream and ready for sale, Chesapeake Marketing sells the finished products to buyers at a price that reflects the value of these additional services.

The two Chesapeake affiliates and the landowners divide the proceeds from the sales. Chesapeake calculates how much the oil and gas were worth at the well (what Chesapeake Marketing owes to Chesapeake Exploration) using the "netback" method. The netback price is the final purchase price minus the post-production costs incurred to move the oil and gas downstream and prepare it for sale. That calculation accounts for the fact that the products are more valuable after they have been processed. Chesapeake Exploration in turn uses the netback price as the royalty base for calculating payments to the landowners. The landowners take a one-eighth share from that price.

Dissatisfied with this practice, a class of over 600 landowners led by Dale Henceroth sued Chesapeake Exploration in 2015. As they see things, royalty payments should be calculated as one-eighth of the price to the ultimate buyers, not the price paid by Chesapeake Marketing. According to their damages expert, using a downstream royalty base would have led to $2.01 million in additional royalties since 2011, distributed among over 600 property owners with various sized tracts of land. At the close of discovery, the district court granted summary judgment to Chesapeake Exploration.

II.

Oil and gas leases are governed by ordinary rules of contract interpretation, meaning that the "language" of the "lease agreement," the first rule of contract interpretation, sets the parties' rights and obligations. *Lutz v. Chesapeake Appalachia, LLC*, 71 N.E.3d 1010, 1011 (Ohio 2016). The short answer is that Chesapeake Exploration's actions conform to the language of the leases. It sells oil and gas at the well to Chesapeake Marketing, and pays royalties to the landowners based on the proceeds it receives from that sale.

The long answer ends in the same place. Start with the gas leases. The gas royalty provision says that Chesapeake Exploration must pay "an amount equal to one-eighth of the net proceeds realized by Lessee [Chesapeake Exploration] from the sale of all gas and the constituents thereof produced and marketed from the Leasehold." R. 147-3 at 3. The key language is "produced and marketed from the Leasehold," and it shows that the first sale price is the proper royalty base. Chesapeake Exploration extracts the raw product from the ground ("produced") and immediately sells it to Chesapeake Marketing ("marketed"). Title passes in exchange for a price, which qualifies as a sale under Ohio law. *See* Ohio Rev. Code Ann. §§ 1302.01(A)(11), 1302.03(A). And all of this happens at the property ("from the Leasehold"), not downstream. That geographic limitation calls to mind the more common "at the well" language, which courts have interpreted to authorize a netback royalty calculation even in the absence of an actual sale at the well (like we have here). *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 242–43 (6th Cir. 2011); *see also* 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law*, Manual of Oil & Gas Terms at "A" (2019) (collecting cases).

Turn to the oil leases. Chesapeake Exploration must "deliver to the credit of [the landowner], free of cost, a Royalty of the equal one-eighth part of all oil and any constituents

thereof produced and marketed from the Leasehold." R. 147-3 at 3. This provision contains the same "produced and marketed from the Leasehold" language, and the same interpretation follows. That the lease says the landowners may take "part" of the oil itself instead of money (a common formulation in the industry), 3 Martin & Kramer, *Oil and Gas Law*, § 659 (2019), further supports Chesapeake's view. Otherwise, the lease would require Chesapeake to process and move oil away from the property at considerable expense, then separate out one-eighth of the refined product and transport it back. The symmetry makes sense. Whether the royalty is paid in cash or oil, the one-eighth calculation occurs before the oil has been refined and transported and after considering its value at *that* point.

Chesapeake Exploration also complies with the "free of cost" limitation in the oil royalty provision because it does not deduct its own costs—the extraction costs. This too is standard industry lease language and standard practice: Oil and gas royalties are typically "free of the costs of production." *Id.* § 642.3. And this language does not call the netback method into question. The calculation merely deducts Chesapeake Marketing's processing and transportation costs, not Chesapeake Exploration's production costs. As other courts have determined in the face of similar clauses, the netback method does not deduct costs. It is "nothing more than a method of determining market value at the well in the absence of comparable sales data at or near the wellhead." *Potts v. Chesapeake Expl., LLC*, 760 F.3d 470, 475 (5th Cir. 2014).

Also supporting this interpretation is trade "usage." Ohio Rev. Code Ann. § 1310.09(A); *Abram & Tracy, Inc. v. Smith*, 623 N.E.2d 704, 709 (Ohio Ct. App. 1993). It is standard practice in the industry to calculate the wellhead sales price using the netback method and to use the netback price to calculate landowners' royalties. Why? A netback royalty base avoids a windfall to landowners. "If the landowner's royalty is calculated on the amount received by the lessee

downstream . . . [,] the landowner receives *more* than one-eighth of the value of the raw gas produced from his property." *Baker v. Magnum Hunter Prod.*, 473 S.W.3d 588, 595 (Ky. 2015). He instead receives a royalty based on "an enhanced product, without having borne any of the costs associated with turning the raw gas into that more valuable product." *Id.* The netback method takes care of this problem and is "fair in every sense." *Id.*; *see also Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 894 (Mich. Ct. App. 1997).

Henceroth says that three words in the leases—"sale," "marketed," and "realized"—lead to a different conclusion. Consider them one at a time.

*Sale.* Henceroth maintains that the gas sales from Chesapeake Exploration to Chesapeake Marketing are invalid because they are conducted under an unsigned contract. But contracts need not be signed, or sometimes even be in writing, to be enforceable. A contract for the sale of goods can be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Ohio Rev. Code Ann. § 1302.07(A); *Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1300 (Ohio Ct. App. 1982). A consistent practice of purchase orders, delivery, and money exchanged (as here between Chesapeake Exploration and Chesapeake Marketing) suffices. *See, e.g.*, *Am. Bronze*, 456 N.E.2d at 1300. That remains true even if the signature page of the contract remains blank. *See Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 375 N.E.2d 410, 413–14 (Ohio 1978).

Also unavailing is Henceroth's argument about oil sales. He claims that this contract does not apply in Ohio, noting that the contract covers land leases "described on the attached Exhibit 'A'" and Exhibit A does not list any Ohio locations. R. 148-7 at 4. But another term in the contract undermines the point. The contract's title refers to "all states," bolded and underlined at the top. R. 148-7 at 4. "[A]cts by the parties" at any rate may "demonstrate the construction they gave to

their agreement." *Lutz*, 71 N.E.3d at 1012. Chesapeake Exploration and Chesapeake Marketing have consistently treated the contract as covering Ohio. Nearly ten years into this relationship, it's too late to change that reality now.

*Marketing.* Henceroth argues that Chesapeake Exploration does not "market" oil and gas to Chesapeake Marketing; the only marketing occurs when the latter sells products to unaffiliated third parties. But an Ohio appellate court recently rejected a different plaintiff's attempt to make this argument, indeed against Chesapeake Exploration itself. The court reasoned that Chesapeake Exploration "marketed" oil and gas at the well when it sold products to Chesapeake Marketing. *Gateway Royalty, LLC v. Chesapeake Expl., et al.*, No. 19 CA 0933, 2020 WL 1671626, at *4–*5 (Ohio Ct. App. Apr. 3, 2020). The decision takes some of the *Erie* guesswork out of our task in this diversity case. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Sys.*, 249 F.3d 450, 454 (6th Cir. 2001). It also seems right. The definition of "market" is "to expose for sale in a market" or to "sell," *Merriam-Webster Unabridged Online* (2016), which is what happens when Chesapeake Exploration sells oil and gas to Chesapeake Marketing. *See also Gateway Royalty*, 2020 WL 1671626, at *4. The "ordinary meaning" of "marketing" does not require a set level of promotional activities. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). Nor does it matter that Chesapeake Marketing, true to its name, *also* markets oil and gas. There's nothing unusual about multi-level vertical supply chains that include sales and marketing at each level. Try getting a job at any level of a supply chain while disclaiming an interest in sales or marketing.

*Realized.* Noting that the gas lease requires payment in "an amount equal to one-eighth of the net proceeds realized," R. 147-3 at 3, Henceroth insists that Chesapeake Exploration does not "realize" any proceeds because it receives an intercompany receivable from Chesapeake Marketing, not cash. But an accounting entry of this sort does not mean that the transfer does not

generate money. Chesapeake's accounting expert confirmed as much, explaining that "Chesapeake Exploration realizes revenue" when it sells oil and gas to Chesapeake Marketing. R. 148-11 at 22. Chesapeake Exploration also treats the payment as money, using it to pay expenses, confirming that it indeed "realizes" proceeds from the sales.

Henceroth does not challenge this conclusion with an accounting expert of his own. He instead relies on out-of-context language from a few cases—mostly outside of Ohio, none from this circuit. His one Ohio case, *Hamlin v. Collins*, 459 N.E.2d 520 (Ohio 1984), concerned the appropriate amount of backpay for a wrongfully discharged employee. The court interpreted the word "receivable" in a pension contribution statute to mean money "due or owing." *Id.* at 525. That meant the defendant had to make pension contributions based on the salary the employee should have gotten after he was wrongfully discharged, rather than the reduced salary he actually received, because the higher salary was "due or owing." *Id.* at 525. But the court never looked at what matters here: the accounting effect of a transaction or the meaning of "realized."

Henceroth's other authorities are no more helpful, and none contradicts our analysis. *See In re O'Neil*, 177 B.R. 809, 814 (Bankr. S.D.N.Y. 1995) (interpreting the Internal Revenue Code's definition of "money"); *Frank Briscoe Co., Inc. v. Travelers Indem. Co.*, 899 F. Supp. 1304, 1313 (D.N.J. 1995) (determining that the words "net proceeds realized" in an insurance contract were "synonymous with 'received'"). One case even supports our conclusion, reasoning that "accounts receivable[]" are "a form of current assets, which include cash." *Emerald Coast Finest Produce Co. v. United States*, 79 Fed. Cl. 466, 473 (Fed. Cl. 2007) (quoting Robert N. Anthony & James S. Reece, *Accounting Principles* 34 (5th ed. 1983)).

*Sham transaction.* A common theme running through Henceroth's arguments is that the transaction between Chesapeake Exploration and Chesapeake Marketing should not be respected

because Chesapeake Exploration lacks adequate physical office space and employees. But that tells half the story. While Chesapeake Exploration may be thinly staffed, that is because it conducts operations through a different entity, Chesapeake Operating. Under an agency agreement between the two entities, Chesapeake Operating handles Chesapeake Exploration's day-to-day activities, including collecting payments and disbursing royalties. Henceroth never explains why this matters at any rate. The corporate form must be respected in the absence of (among other things) "fraud, an illegal act, or a similarly unlawful act." *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 545 (Ohio 2008). No such allegation appears in the complaint, which raises a run-of-the-well claim of breach of contract. That's presumably why Henceroth never argues that the corporate form should be ignored or that Chesapeake Exploration is a mere alter ego of another Chesapeake entity. He instead suggests that Chesapeake Exploration's supposed deficiencies mean its actions are legally void. That's veil-piercing by another name and without the necessary predicate.

He claims that two decisions support this theory. *See Potts v. Chesapeake Expl., LLC*, No. 3:12-CV-1596-O, 2013 WL 874711 (N.D. Tex. Mar. 11, 2013); *Schoop v. Devon Energy Prod. Co.*, No. 3:10-CV-650, 2013 U.S. Dist. LEXIS 188345 (N.D. Tex. Mar. 28, 2013). That they are unpublished and come from outside the circuit only partly explains their deficiency. *Potts* ruled in Chesapeake's favor, concluding that the sale between Chesapeake Exploration and Chesapeake Marketing was valid and amounted to the proper time to calculate the royalty. *Potts*, 2013 WL 874711, at *6, *8. *Schoop* also concluded that the at-the-well sale was legitimate. 2013 U.S. Dist. LEXIS 188345, at *44. And while it did let a "sham transaction" theory go to trial, the relevant affiliate was far more ephemeral than Chesapeake Exploration. It lacked its own "financial

statements," "property," and "business ident[ity]," *id.* at \*49–\*51, it did not have an operating company to back it up, and the party in fact *made* a piercing-the-veil argument.

That leaves one last argument. Citing another out-of-circuit district court case, Henceroth says a new "body of law," Appellant Br. 28, controls the post-production costs Chesapeake Exploration may deduct from the royalty base. *Pollock v. Energy Corp. of Am.*, No. 10-1553, 2015 WL 3795659 (W.D. Pa. June 18, 2015). But this argument depends on accepting that Chesapeake Exploration is deducting its own costs, accepting in other words the key premise of his case: that there is no independent sale of oil and gas from Chesapeake Exploration to Chesapeake Marketing. That argument has already been raised and refuted.

We affirm.