RENDERED: AUGUST 16, 2018
TO BE PUBLISHED

# Supreme Court of Kentucky

2015-SC-000489-DG
2016-SC-000235-DG



DATE 9/6/18 Kim Redman, DC

NAMI RESOURCES COMPANY,
L.L.C., TRUST ENERGY COMPANY, L.L.C.,
VINLAND ENERGY OPERATIONS, L.L.C.,
VINLAND ENERGY EASTERN, L.L.C., AND
VINLAND ENERGY GATHERING, L.L.C.,
AND ASHER LAND AND MINERAL,
L.T.D.

APPELLANTS/CROSS-APPELLEES

V.

ON REVIEW FROM COURT OF APPEALS
CASE NOS. 2012-CA-000762-MR, 2012-CA-001438-MR,
AND 2012-CA-001439-MR
BELL CIRCUIT COURT NO. 06-CI-00566

ASHER LAND AND MINERAL, LTD,
VANGUARD NATURAL RESOURCES, LLC,
VANGUARD NATURAL GAS, LLC, AND
NAMI RESOURCES COMPANY, LLC

APPELLEES/CROSS-APPELLANTS

## OPINION OF THE COURT BY JUSTICE VENTERS

### AFFIRMING IN PART, VACATING IN PART, REVERSING, AND REMANDING

Appellants, Nami Resources Company, LLC, and four associated entities[1]

(collectively identified as "Nami") appeal from an opinion of the Court of

Appeals which upheld a jury verdict against Nami in the sums of

---

[1] The five Appellants are Nami Resources Company, LLC; Trust Energy
Company, LLC; Vinland Energy Eastern, LLC; Vinland Energy Operations, LLC; and
Vinland Energy Gathering, LLC.

$1,308,403.60 in compensatory damages and $2,686,000.00 in punitive damages. The verdict arises from an action brought by Appellees, Asher Land and Mineral, Ltd., and two other entities[2] (collectively identified as "Asher") asserting that Nami had violated its contractual obligations by fraudulently underpaying royalties owed under the leases that governed Nami's extraction of natural gas from Asher's land.

Asher asserted its claim for unpaid royalties under two overlapping theories: (1) breach of contract and (2) fraudulent misrepresentation of the factors that determined the royalties owed to Asher, specifically the quantity of gas extracted from Asher land, the actual costs associated with Nami's processing of the gas, and the market price for which the gas was ultimately sold.

Nami argues on discretionary review that: (1) the Court of Appeals and the trial court erred by failing to set aside the award of compensatory damages which Nami contends was based upon flawed evidence which should have been excluded by the trial court; and (2) the award of punitive damages was improper because Asher's claim is fundamentally a breach of contract action. Nami contends that the judgment should be reversed, and Asher's claims dismissed. In the alternative, Nami argues that a new trial must be granted for various trial errors that occurred.

---

[2] The three Appellees are Asher Land and Mineral, Ltd.; Vanguard Natural Resources, LLC; and Vanguard Natural Gas, LLC.

On cross-appeal, Asher asserts that: (1) Nami's appeal should have been dismissed by the Court of Appeals because Nami's motions for post-judgment relief preserving the issues were not timely presented in the trial court; and (2) the trial court erroneously denied Asher's motion to amend its complaint to allege that Nami committed trespass by extracting gas from land not subject to the gas leases.

For the reasons stated below, we conclude that the award of punitive damages, for what is essentially a breach of contract, was improper and must be vacated. Otherwise, we affirm the Court of Appeals' decision upholding the award of compensatory damages as determined by the trial court and jury. We also affirm the Court of Appeals' conclusion that Nami's post-verdict motions were made timely, that no errors committed during the trial warrant a setting aside of the verdict and the granting of a new trial, and that the trial court properly denied Asher's motion to amend its complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Asher acquired from its predecessors-in-interest the rights as lessor under three separate gas leases, executed respectively in 1929, 1952, and 1953, covering certain natural gas reserves in Bell County, Kentucky. As relevant to our review, all three leases contain essentially the same royalty provisions. As the successor lessee under all three leases, Nami acquired the right to extract Asher's natural gas in return for the royalty payments prescribed in the leases. As a result of this relationship, Nami's gas wells on Asher's property became part of Nami's network of small regional pipelines

3

connecting more than eight hundred gas wells to the larger natural gas transmission systems operated by Columbia Gas and Delta Gas.

The dispute before us concerns the validity of Nami's calculation of royalties payable to Asher over a period of several years. Meters attached to each wellhead measured and recorded the volume of natural gas extracted. Each month, Nami sent Asher a royalty check with a report citing the volume of gas extracted from each well, the price per thousand cubic foot unit (Mcf) Nami received from the sale of the gas, and the post-production costs that Nami deducted from the sales price in the royalty calculation.

As was customary in the era in which they were executed, royalties payable under the Nami-Asher gas leases are based upon the market price for gas sold at the wellhead, the "at the wellhead" price.[3] Because of subsequent technological and market changes, gas is no longer marketed at the well and there is no market price for gas at the wellhead. Instead, gas is collected by the lessee at the wellhead, processed to remove water and other impurities, and transported with gas from other wells in the area through pipelines to a central point of sale and distribution.

To accommodate that shift, the industry has adopted the customary and proper business practice of calculating the lessor's royalty by replicating an "at

---

[3] The 1929 lease required Nami to pay to Asher "for gas from each well, while the same is sold off the premises, the equal of one-eighth of the market price of said gas, to be paid monthly." Similarly, the 1952 and 1953 leases required Nami to pay "for gas from each well where the gas is found, the equal of one-eighth (1/8) of the gross proceeds, at the prevailing market rate, for all gas sold, used or manufactured into gasoline, carbon black or other by-products, on or off premises."

4

the wellhead" price. This is done by deducting from the gross price what the lessee receives for the gas, certain post-production expenses incurred by the lessee to process the gas and to move it from the wellhead to the point of sale. Known as "gathering costs" and "post-production costs," these expenses are generally understood to include the expenses incurred to remove water vapor and other impurities such as carbon dioxide, nitrogen, and hydrogen sulfide found in gas in its natural state. The gas is moved through the pipelines by compressors which are fueled by consuming a small portion of the extracted gas. That process results in "line loss," meaning that less gas reaches the market than was metered at the wellhead.

These types of costs are generally regarded as part of the natural and unavoidable expenses associated with the production and marketing of natural gas after it is extracted from the well. Our recent cases have made clear that such costs are properly deducted by the lessee in calculating its royalty obligation to the lessor. *See Baker v. Magnum Hunter Production, Inc.*, 473 S.W.3d 588 (Ky. 2015); *Appalachian Land Co. v. EQT Production Co.*, 468 S.W.3d 841 (Ky. 2015). Nami and Asher agree with this industry-wide practice. Nami's calculation of Asher's royalties ostensibly adhered to this customary practice, although the parties vigorously dispute the accuracy of the figures Nami used in its calculation of these costs.[4]

_____

[4] Nami's calculation also allocated to Asher a portion of the Kentucky severance tax paid on the gas extracted from Asher's reserves. Subsequently, in *Appalachian Land Co.*, we rejected that practice based upon our interpretation of the severance tax

5

In December 2006, Asher filed suit against Nami in Bell Circuit Court alleging that Nami breached the Asher leases, underpaying the contractual royalties by intentionally overstating its post-production costs, understating the quantity of gas extracted, and understating the market price of the gas sold. Asher demanded the forfeiture or termination of the leases, an accounting of the royalties payable under the leases, and compensation for the underpayment of the royalties payable under the leases. Nami denied that it had breached the leases. In light of the forfeiture claim, Nami filed a counterclaim alleging that Asher breached the leases by preventing Nami from drilling additional wells during a period of elevated gas prices, thereby causing Nami to lose revenues and profits available from expanded gas production.

In March 2011, Asher filed a fifth amended complaint asserting a claim for conversion based upon the allegation that Nami's Well #35 was drawing natural gas from beneath a tract of Asher's property (the Carlson tract) not covered by any of Nami's leases. After the trial court granted summary judgment for Nami dismissing Asher's conversion claim pertaining to Well #35, Asher sought to amend its complaint, restating the dismissed conversion claim as a claim for trespass.

As to Asher's overall claims, the trial court concluded that disputed issues of material fact precluded summary judgment and the case went to trial. The trial court opted to submit the issues of fact to the jury through the use of

---

statutes. Nami concedes that its apportionment of severance taxes to Asher was incorrect and it has deposited that amount into a circuit court escrow account.

6

special interrogatories rather than general instructions on the law. The jury determined in response to jury instruction Interrogatories No. 1 and No. 2 (titled "Breach of Contract-Royalties") that Nami had underpaid royalties owed to Asher by deducting post-production costs which were not actually incurred and were not reasonable. On the answer blank labeled, "Unpaid royalties," the jury fixed the amount owed by Nami at $1,308,403.60. The jury also determined in response to Interrogatories No. 6 and No. 7 (titled "Fraud") that Nami had underpaid royalties due under the lease by "(a) reporting incorrect volumes of natural gas produced from the [Asher] wells . . . (b) reporting inaccurate sales prices for the natural gas produced from the [Asher] wells . . . (c) reducing the gross sales figures by improper expenses." In the answer blank provided for that interrogatory, labeled "Financial loss," the jury reiterated that Nami owed Asher $1,308,403.60.

It is clear from a review of these jury interrogatories that the improper deduction of "costs" described in Interrogatories No. 1 and No. 2 is part of the same financial loss covered by Interrogatory No. 6 as "improper expense" and awarded under Interrogatory No. 7. Recognizing that the "Unpaid royalties" found by the jury under Interrogatory No. 2 was recompense for the same "Financial loss" found under the more broadly defined damages awarded in Interrogatory No. 7, the trial court eliminated an improper double recovery by restricting Asher's judgment to a single award of $1,308,403.60 in compensatory damages. Neither of the two identical findings was stricken; the court simply recognized the redundancy and drafted the judgment accordingly.

7

The jury also awarded Asher $2,686,000.00 in punitive damages for Nami's malevolence in underpaying Asher. After considering the $111,686.40 in severance taxes that Nami improperly charged to Asher,[5] the trial court's judgment awarded Asher a total of $4,106,090.00. As reflected in its response to Interrogatory No. 10, the jury also rejected Nami's counter-claim alleging that Asher had improperly restricted its well-drilling rights. Nami moved pursuant to CR 50.02 for judgment notwithstanding the verdict and alternatively, for a new trial. The trial court denied the motions.

Nami appealed and Asher cross-appealed. Following an extended three-year review, the Court of Appeals issued an opinion upholding all aspects of the trial court's judgment. We accepted discretionary review to examine, among other things, Nami's argument that Asher failed to provide sufficient evidence to sustain the jury's compensatory damage award, the propriety of Nami's calculations of post-production costs used to calculate Asher's royalty, and to examine the propriety of punitive damages for what is essentially a breach of contract claim. We begin, however, with a threshold issue, raised in Asher's cross-appeal which could be entirely dispositive: whether Nami's right to appellate relief was waived by a failure to seek timely post-trial relief.

## II. NAMI'S MOTIONS FOR POST-JUDGMENT RELIEF WERE TIMELY MADE

Shortly after the entry of the trial judgment, Nami sought post-judgment relief in the form of motions for judgment notwithstanding the verdict, for a

---

[5] See note 4.

8

new trial, and to alter or amend the judgment. Asher contends, as it argued unsuccessfully in the trial court and Court of Appeals, that Nami's motions for post-trial relief were not timely filed, and therefore, all of Nami's arguments in this appeal predicated upon those motions were waived. We disagree.

Motions for judgment notwithstanding the verdict must be made "[n]ot later than 10 days after entry of judgment." CR 50.02. A motion for a new trial and a motion to alter or amend a judgment must "be served not later than 10 days after entry of the judgment." CR 59.02; CR 59.05. The tenth day after entry of the judgment in this case was April 6, 2012, which happened to be Good Friday. According to the trial court, Nami's motions were filed and served on Monday, April 9, 2012.

CR 6.01 provides that when the last day of "any period of time prescribed or allowed by [the Kentucky Rules of Civil Procedure] . . . is a Saturday, Sunday, or a legal holiday," the time period does not expire "until the end of the next day which is not a Saturday, Sunday, or legal holiday." CR 6.01 applies to time periods imposed for the *service* of a pleading. *See Gish v. Brown*, 338 S.W.2d 383 (Ky. 1960) (Pursuant to CR 6.01, when the defendants were required to serve their answer within 20 days, which fell upon a holiday identified in KRS 2.110, service on the following day was timely.). The question of whether Nami's post-trial motions were timely turns on whether Good Friday was a "legal holiday." Neither CR 6.01, nor any other provision of the civil rules, defines the term "legal holiday."

9

Asher argues that Good Friday is not a legal holiday because it is not included among the "public holidays" listed in KRS 2.110(1) as days "on which all the public offices of this Commonwealth may be closed."[6] However, KRS 18A.190(1)(c) identifies "Good Friday" as a "holiday" upon which "[s]tate offices shall be closed and state employees shall be given a holiday" of one-half day.[7]

CR 6.01's use of the generic term "legal holiday" was not designed as a trap to ensnare the unwary lawyer or litigant. Nor do we intend for our rules to vex lawyers and litigants by forcing them to decide if the "holidays" or the "public holidays" listed in various statutory provisions are "legal holidays." The argument is sufficiently put to rest by saying that the closing of the state courthouses and circuit clerk's offices for one half-day on Good Friday is expressly authorized by law and, therefore, Good Friday constitutes a "legal holiday" for purposes of CR 6.01. Consequently, Nami's motions for post-

---

[6] KRS 2.110(1) identifies the following as "holidays" upon which public offices may be closed: The first day of January (New Year's Day), the third Monday of January (Martin Luther King, Jr.'s Birthday), the nineteenth day of January (Robert E. Lee Day), the thirtieth day of January (Franklin D. Roosevelt Day), the twelfth day of February (Lincoln's Birthday), the third Monday in February (Washington's Birthday), the last Monday in May (Memorial Day), the third day of June (Confederate Memorial Day, and Jefferson Davis Day), the fourth day of July (Independence Day), the first Monday in September (Labor Day), the second Monday in October (Columbus Day), the eleventh day of November (Veterans Day), the twenty-fifth day of December (Christmas Day) of each year, and all days appointed by the President of the United States or by the Governor as days of thanksgiving.

[7] KRS 18A.190(1) provides as follows: "State offices shall be closed and state employees shall be given a holiday on the following days": (a) The first day of January plus one (1) extra day; (b) The third Monday in January; **(c) Good Friday, one-half (1/2) day**; (d) The last Monday in May; (e) The fourth day of July; (f) The first Monday in September; (g) The eleventh day of November; (h) Presidential Election Day as required under KRS 2.190; (i) The fourth Thursday in November plus one (1) extra day; and (j) The twenty-fifth day of December plus one (1) extra day." (Emphasis added.)

10

judgment relief were filed and served on time. We affirm the Court of Appeals on this issue.

### III.  ASHER ADEQUATELY PROVED THAT NAMI BREACHED THE LEASES BY UNDERPAYING ROYALTIES

As noted above, we recognized in *Baker v. Magnum Hunter Production, Inc.* and *Appalachian Land Co. v. EQT Production Co.* that the royalties typically provided in the traditional gas leases executed generations ago could not be calculated as stated under the leases because natural gas was no longer marketed at the wellhead. Consequently, the industry settled upon an alternate means of replicating the royalty payment intended under the old gas leases by permitting lessees to deduct from their sales price the post-production costs incurred to get the gas to market in a sellable condition.

Often, a complaint alleging the breach of a contract involves a provision of the contract that is separate and apart from the obligation to pay the price due under the contract. In this case, however, because the breach alleged by Asher is Nami's failure to pay in accordance with the requirements of the contract, the same evidence that proves the breach simultaneously proves the damages. Nami argues that by failing to prove compensatory damages with reasonable certainty, Asher has, per force, failed to prove the breach with reasonable certainty.[8]

---

[8] Nami preserved this issue for appellate review by moving for a directed verdict at the conclusion of both Asher's case-in-chief and its own case-in-chief and by seeking a judgment notwithstanding the verdict pursuant to CR 50.02.

11

Nami's primary complaint is that Asher failed as a matter of law to prove that Nami breached the lease contracts because it failed to prove any compensable loss. Thus, Nami argues, the trial court and the Court of Appeals erred in upholding the award of $1,308,403.60. Nami contends that Asher failed to prove any damages for unpaid royalties because the expert upon whom it relied, Mark Enderle, calculated the unpaid royalties using the false assumption that Nami incurred no gathering costs. It follows that without proof of damages, one has no claim for breach of contract.

Specifically, Nami argues that Enderle's testimony was inherently deficient because he assumed as true the impossible fact that Nami incurred none of the routine and inescapable post-production expenses that this Court recognized in *Baker* and *Appalachian Land Co.* We are not persuaded by Nami's argument because we do not agree with Nami's characterization of Enderle's testimony.

The trial court recognized that Asher, as the plaintiff, had the burden of proving the elements of its claim and that Asher maintained the risk of non-persuasion throughout the trial, at least with respect to the claims it asserted in its complaint and amended complaints. Asher introduced Enderle and witnesses from within Nami's organization that discredited the figures Nami used in its royalty calculations. Asher's evidence challenged the reliability of three components of the royalty calculations: the quantity of gas Nami claimed was taken from Asher wells, the price for which Nami claimed the gas was sold, and the post-production and gathering costs Nami claimed to have incurred.

12

Nami claimed it had properly calculated Asher's royalties and on that point, Nami had the burden of showing that its gathering costs were actual and reasonable. The trial court determined that once Nami had produced evidence to show what costs it incurred, the burden of going forward to contradict that evidence shifted to Asher. Thus, Asher ultimately had the burden of proving that Nami breached the leases by deducting costs that were either not actually incurred or not reasonable. Nami used what it claims was a widely accepted industry standard for gathering costs: $0.55 per Mcf (thousand cubic feet of gas), and in later years, revised it to $0.59 per Mcf.

Enderle testified that the lessor's gas royalty payment under the leases is calculated using this formula: the "field price" (which equals the total net sales/total volume, thousand cubic feet units (Mcf)) × individual well volumes × the lessor's royalty fraction, 1/8 or .125. Enderle calculated the unpaid royalties plus accrued interest to be $1,420,088.00. He included Nami's improper inclusion of severance taxes, so when Nami placed the severance tax of $111,686.40 in escrow pending the resolution of this case, Enderle's damage figure was adjusted to $1,308,403.60. Enderle also testified that even if Nami's costs should be credited at the $0.55/$0.59 per Mcf standard, then Asher was still underpaid by $1.1 million. The trial court had recognized that Nami had complete control of its accounting records and that Asher's ability to gain credible access was limited.

Enderle explained to the jury his examination of Nami's documents and how he determined Nami's volume and price understatements. He used in his

13

calculation Nami's volume understatement, price understatement, and improper deduction of expenses (e.g., hedge losses, Nami's $0.55/$0.59 per Mcf internal transportation charge, and third-party gas purchases). He testified that when calculating net sales, Nami deducted a charge of $0.55/$0.59 per Mcf for gathering costs on Nami's own pipeline, a system-wide charge, and that Asher's gas was transported only a short distance before being transported by third-party pipelines owned by other companies, such as Delta and Columbia. When Enderle calculated the amount of royalties Nami owed Asher, the net sales figure included allowable charges for which Nami provided proof. Nami only provided documentation for third-party transportation and marketing costs; Nami did not provide proof the $0.55/$0.59 per Mcf gathering charge on Asher's property was actual and reasonable so that charge was not deducted.

Enderle further acknowledged gathering costs when he testified that in his damage calculation, Nami's volume shortages were substantially more than the allowance for the $0.55/$0.59 per Mcf gathering charge. Enderle stated that if the $0.55/$0.59 per Mcf charge were valid (actual, reasonable, supported), the damage computation was about $1.1 million. Enderle's damage calculation provided the amount of damages owed to Asher if Nami were successful in producing evidence that its $0.55/$0.59 per Mcf gathering charge was actual and reasonable.

Contrary to Nami's argument, Enderle did not assume an impossible fact that Nami only incurred third-party transportation costs and no routine post-

14

production expenses. To prove that Nami's claimed expenditures for gathering costs were not actually incurred or were unreasonable, Asher introduced evidence from various Nami employees. For example, Arianna Nami, a senior accountant at Nami who was designated by Nami to testify to its gathering charges, stated she did not know how the charge was computed or how Nami's actual gathering costs correlated with the $0.55/$0.59 per Mcf it charged to Asher's royalty calculation. Vicki Griffith, Nami's former CFO, testified that she was unsure how the gathering charge was calculated and whether it incorporated a profit component. Nami countered with witnesses testifying to costs associated with Nami's pipelines, compression stations, and dehydration equipment; the spreading of the system-wide costs across royalty owners; and the actual cost exceeding the $0.55/$0.59 per Mcf deduction from Asher's royalties.

Nami directs our attention to *Coney Island v. Brown*, 162 S.W.2d 785 (Ky. 1942), and *Louisville & N.R. Co. v. Chambers*, 178 S.W. 1041 (Ky. 1915), for the principle that a jury verdict that rests upon indisputably impossible circumstances cannot stand. That principle has no application here.

Enderle's opinion does not presume the physical impossibility of processing and transporting gas at no cost. His testimony challenged the accuracy of the price Nami attached to its processing and transporting of Asher's gas and raised doubts about whether Nami's gathering charges were actual and reasonable. Aside from the issue of how Enderle assessed Nami's

15

costs, he also noted discrepancies in the volumes and sales prices Nami used to calculate Asher's royalty payments.

Nami complains that the Court of Appeals allowed the jury to assume that Nami's gathering costs were "not actually incurred." However, the Court of Appeals ultimately concluded that there was sufficient evidence presented at trial from which the jury could have reasonably concluded that the deductions taken by Nami from Asher's royalty payments were either *unreasonable or not actually incurred.* We agree.

Given the evidence presented, the jury was not limited to deciding, as Nami implies, that the gathering costs were not actually incurred. The jury could have rejected the gathering costs as unreasonable. Either way, it is clear that Enderle's testimony did not defy natural law. We affirm the Court of Appeals' opinion that Asher adequately proved the breach of contract and the underpayment of royalties.

## IV. ASHER IS NOT ENTITLED TO AN AWARD FOR PUNITIVE DAMAGES

Nami next argues that Asher is not entitled to recover punitive damages for Nami's breach of the parties' lease agreements. For the reasons explained below, we agree.

Kentucky common law has long accepted the general rule that punitive damages are not ordinarily recoverable for a breach of contract.[9] As a relatively

---

[9]*Hardaway Management Co. v. Southerland*, 977 S.W.2d 910, 917 (Ky. 1998) ("[F]raudulent concealment is actionable only if the concealment itself caused damages independent of those flowing from the wrongful act attempted to be concealed."); *Deaton v. Allstate Insurance Co.*, 548 S.W.2d 162, 164 (Ky. App. 1977); *General*

recent attempt to codify that principle, KRS 411.184(4) provides: "In no case shall punitive damages be awarded for breach of contract." Consistent with this provision, in *Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 486 (Ky. App. 1978), the Court of Appeals quoted *Hibshman Pontiac, Inc. v. Batchelor*, 340 N.E.2d 377 (Ind. App. 1976). *Hibshman* overturned an award of punitive damages in an action brought against General Motors Corporation and its dealer for failure to carry out the express warranty to repair or replace defects in a new automobile. The *Hibshman* court explained the following rationale for denying punitive damages based upon a breach of contract:

> Many breaches of contract arise because of a valid dispute as to the scope of the contractual obligation or because of inability to perform. Clearly, breach of contract in such cases is not a "wrong" warranting punishment by punitive damages. Even in cases of unjustified intentional breach of contract unaccompanied by tortious conduct, we do not believe that the "wrong" involved is a wrong warranting the intrusion of punitive damages into a private transaction. The threat of punitive damages should not be allowed to chill the assertion of a valid contract dispute or to foreclose a contracting party from breaching a contract he no longer desires to consummate. With the exception of recovery of attorney fees, the aggrieved party has an adequate remedy in the recovery of compensatory damages.

*Id.* at 380.

The rule against recovery of punitive damages even when the breach is claimed to have been "fraudulent" is further supported by the "Economic Loss Doctrine." Although the term may be used in a slightly different way in other

---

*Accident Fire & Life Assurance Corp. v. Judd*, 400 S.W.2d 685, 688 (Ky. 1966); *Cumberland Telephone & Telegraph Co. v. Cartwright Creek Telephone Co.*, 108 S.W. 875, 878 (Ky. 1908).

contexts, in the present context it is succinctly described in *Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, Inc.*, 868 F.Supp.2d 983, 991–92 (E.D.Cal. 2012):

> [T]he economic loss doctrine "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988, 22 Cal. Rptr. 3d 352, 102 P.3d 268, 272 (Cal. 2004). To that end, the economic loss rule prohibits the recovery of tort damages in a breach of contract case. See *Oracle USA, Inc. v. XL Global Services, Inc.*, No. C 09–00537 MHP, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009) (citing *Butler–Rupp v. Lourdeaux*, 134 Cal. App. 4th 1220, 36 Cal. Rptr. 3d 685 (2005)). "Quite simply, the economic loss rule 'prevents the law of contract and the law of tort from dissolving one into the other.'" *Id.* (quoting *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999)). Courts have applied the economic loss rule to bar fraud claims where "the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract." *Multifamily Captive Group, LLC v. Assurance Risk Managers, Inc.*, 629 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009); see also *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, No. 11–CV–246–IEG (RBB), 2011 WL 3703192, at *3 (S.D. Cal. Aug. 23, 2011). In such cases, permitting a fraud claim to proceed "would 'open the door to tort claims in virtually every case in which a party promised to make payments under a contract but failed to do so.'" *Id.* (quoting *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, No. C07–02499 JCS, 2009 WL 330259, at *17 (N.D. Cal. Feb. 10, 2009)).

Consistent with the foregoing authorities, we reiterate the rule in Kentucky to be that when a plaintiff may obtain complete relief for his contractual losses by means of compensatory damages under a breach of contract claim, even when the breach is motivated by malice and accomplished through fraud, he may not simultaneously recover punitive damages after being made whole on his contractual damages. However, a party who has been aggrieved by fraudulent or malicious conduct which results in damages that

18

differ from the damages sustained by reason of the breach of contract, may assert an independent claim for such fraudulent or malicious conduct seeking whatever damages are appropriate for the independent claim, including punitive damages if otherwise authorized by law.

We very recently addressed a substantially similar issue in *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, ___ S.W.3d ___, 2017 WL 6380218 (Ky. 2017), where we applied the economic loss doctrine cited above. In *Superior Steel*, owner/developer Ascent/Corporex asserted a "Negligent Performance of Contract" claim against general contractor Dugan & Meyers Construction Company, a claim which largely mirrored Ascent/Corporex's contract breach allegations against Dugan & Meyers. We noted that Ascent/Corporex's "Breach of Contract" claim could not be factually differentiated from its "Negligent Performance of Contract" claim. In like manner, the conduct Asher asserts supports the fraud claim is indistinguishable from the breach of contract claim. Citing Justice James Keller's concurring opinion in *Presnell Construction Managers, Inc. v. EH Construction*, 134 S.W.3d 575, 589 (Ky. 2004), we said in *Superior Steel*: "A breach of duty which arises under the provisions of a contract between the parties must be addressed under contract, and a tort action will not lie. A breach of a duty *arising independently* of any contract duties between the parties, however, may support a tort action." 2017 WL 6380218 at *17.

We reaffirm that holding now. Upon application of this rule, we are persuaded that Asher was made whole through its award for unpaid royalties.

19

It asserts no compensable injury beyond its claim for unpaid royalties, and it alleges no misconduct by Nami other than the conduct of breaching the contract by underpaying the royalties due. Accordingly, we reverse the Court of Appeals insofar as its opinion in this matter upheld the improper award of punitive damages for what is essentially a breach of contract claim.

## V. NAMI'S CLAIM THAT ASHER FAILED TO PROVE FRAUD IS MOOT

Nami argues on appeal that Asher failed to prove the elements of common law fraud, specifically that Asher was not misled by Nami's accounting of royalties and did not rely upon any alleged misrepresentations. Nami also contends that the trial court's interrogatories to the jury with respect to fraud, Interrogatory No. 6, and its complement, Interrogatory No. 7, misstated the elements of fraud.

The only justification for punitive damages asserted by Asher was its claim that Nami's breach of contract in the underpayment of royalties was achieved through fraud. For other reasons stated above, we have determined that Asher may not recover punitive damages for what is, in essence, a claim based purely upon a breach of contract. Whether the Nami's conduct was fraudulent and whether the trial court properly set forth for the jury the elements of fraud are now moot questions.

However, with respect to Nami's claim that the compensatory damage award was excessive, in the following section of this opinion we take a closer look at Interrogatories Nos. 6 and 7 because they explicitly provide the measure

20

of damages for the underpayment of royalties that justified the jury's finding of damages in the amount of $1,308,403.60.

## VI. THE COMPENSATORY DAMAGE AWARD IS NOT EXCESSIVE

Nami argues that the award of compensatory damages in the sum of $1,308,403.60 is excessive. Citing *Baker* and *Appalachian Land Co.*, Nami reasserts its argument that the testimony of Enderle, Asher's expert witness on damages, cannot provide evidentiary support for the verdict. CR 59.01(d) provides:

> A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:
>
> (d) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice or in disregard of the evidence or the instructions of the court.

Ordinarily "[t]he amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because [the court] would have reached a different conclusion." *Childers Oil Co. v. Adkins*, 256 S.W.3d 19, 28 (Ky. 2008) (quoting *Hazelwood v. Beauchamp*, 766 S.W.2d 439, 440 (Ky. App. 1989)). "[The jury's] decision should be disturbed only in the most egregious circumstances." *Id.* If the issue of excessive damages has been squarely presented to the trial judge, who heard and considered the evidence, a reviewing court on appeal cannot "substitute [its] judgment on excessiveness for [the trial judge's] unless clearly erroneous." *Asbury University v. Powell*, 486 S.W.3d 246, 264 (Ky. 2016) (quoting *Davis v. Graviss*, 672 S.W.2d 928, 933 (Ky. 1984)).

21

Asher concedes the amount awarded by the jury under Interrogatory No. 2 exceeds the evidentiary support. Asher had asked the trial court to cap the damages under Interrogatory No. 2 with a "not to exceed" amount of $289,982. Asher argues that Nami waived its right to complain about an excessive verdict because Nami insisted that the evidence, although improperly based upon Enderle's flawed opinion, would justify a verdict as high as $1,308,403.60. We need not resolve Asher's waiver argument.

Even if the damages awarded under Interrogatory No. 2 exceeded what the evidence established for the limited damages prescribed within that interrogatory, the same sum awarded under the broader language of Interrogatory No. 7 was within the evidence. As stated above, we are satisfied that Enderle's opinion was properly admitted into evidence for the jury to consider. Interrogatory Nos. 6 and 7 directed the jury to determine Asher's "financial loss" as the difference between the amount of royalties Nami presented on its monthly reports to Asher and the amount that should have been paid without Nami's misrepresentations of the quantity of gas, the sales price received, and the processing expenses. Enderle's testimony clearly supported the $1,304,408.60 award for the total royalty shortage covered by Interrogatory No. 7. The jury returned a verdict consistent with his testimony and so we cannot say the jury disregarded the evidence.

Since the jury complied with the trial court's "not to exceed" amount, the award was consistent with the trial court's instructions. The trial court and

22

the Court of Appeals correctly rejected Nami's claim that the verdict was excessive.

## VII. NAMI IS NOT ENTITED TO A NEW TRIAL

Nami asserts a number of grounds upon which it argues a new trial should be granted. Upon review, we disagree. We affirm the Court of Appeals.

### A. Asher's Closing Argument

Nami argues that it is entitled to a new trial as a result of Asher's "knowing and improper" closing argument which was "calculated, highly prejudicial, and obviously fruitful." The allegation of error was not preserved with a contemporaneous objection, and so, our review is for palpable error under CR 61.02:

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

The Court of Appeals summarily rejected Nami's claim by noting that palpable error review was only available for errors imputed to the trial court, citing *Carrs Fork Corp. v. Kodak Mining Co.*, 809 S.W.2d 699, 701 (Ky. 1991) ("In applying [CR 61.02], palpable error must result from action taken by the Court rather than from an act or omission by the attorneys or litigants."). The Court of Appeals reasoned that the improper closing arguments Nami cited were solely attributable to Asher's trial counsel, and not the trial court, and so, were not eligible for palpable error review under CR 61.02.

The rule stated in *Carrs Fork* is misleading and it overlooks the fact that the avoidance of "manifest injustice" arising from "palpable error" is inherently a responsibility of the trial court. The language of CR 61.02 is identical to its criminal law counterpart, RCr 10.26, and we interpret that language identically. Neither rule contains the limitation from *Carrs Fork* cited by the Court of Appeals.

To qualify as "palpable error" under either rule, an error "must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte*." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017).

Of course, an improper closing argument or other error of trial counsel is not the fault of the trial court. We do not expect trial judges to detect and correct *sua sponte* every obscure and subtle error that escapes the attention of trial counsel. But when an error at trial is easily perceptible, obvious, and readily noticeable, and is so egregiously prejudicial as to cause "manifest injustice," then the trial court has a duty to take corrective action. We clearly and unequivocally reject the view that palpable error review is not available to correct manifest injustice arising from conduct of trial counsel. Lest the *Carrs*

24

*Fork* misstatement continue to be applied, we take this occasion to overrule that case to the extent of the misstatement.[10]

Nami identifies four explicit instances of alleged improper statements made by counsel during Asher's closing argument. The first improper statement identified by Nami is the statement of Asher's counsel that Nami's conduct was worthier of punitive damages than any he had seen in thirty-two years of practice. While this statement perhaps has an obvious degree of hyperbole to it, we do not regard it as outside the scope of proper advocacy so as to be obviously improper. It certainly did not create manifest injustice to qualify for palpable error.

Nami's second complaint in this regard is the statement of Asher's counsel referring to Nami's size and financial wherewithal as a means of suggesting that the company could afford to pay a large punitive damages award. References to the wealth and resources of a party are generally not permitted. *See Hardaway Management Co. v. Southerland*, 977 S.W.2d 910, 916 (Ky. 1998) ("It has been the law of this Commonwealth for almost one hundred years that in an action for punitive damages, the parties may not present evidence or otherwise advise the jury of the financial condition of either side of the litigation."). We do not regard the error as palpable and as requiring a retrial, especially in light of our conclusion that punitive damages are not

---

[10] The same misconstruction of the law also appears in *Burns v. Level*, 957 S.W.2d 218, 222 (Ky. 1997); *Childers Oil Co. v. Adkins*, 256 S.W.3d 19, 26 (Ky. 2008); and *Fischer v. Fischer*, 348 S.W.3d 582, 589 (Ky. 2011).

available, thereby effectively curing any excess in the award of punitive damages.

The third area identified by Nami as improper consists of a variety of references to Nami's legal team as an "army of lawyers," with the insinuation that this "army" was hiding the truth, and that Nami's evidentiary objections were intended to hide relevant information from the jury. Of course, due process entitles a defendant in a civil lawsuit to have counsel and to vigorously defend the action. *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 257 (1st Cir. 1986). Demagogic or derisive comments alluding to a party's financial ability to retain effective counsel are improper. Alluding to Nami's use of proper legal defenses and their reliance upon our civil laws and evidentiary rules as something shameful and improper is likewise improper argument. Nevertheless, we do not see manifest injustice arising from the trial court's failure to intervene when Nami's trial counsel failed to complain.

Nami's fourth and final area of concern is the claim that Asher attempted to provoke racial and nationalistic prejudices by persistently referring to Nami's principal owner by his first name, Majeed, rather than Mr. Nami, or simply "Mike," the name he has used since he arrived in the United States in the late 1960s. Using any party's name as a pejorative racial, ethnic, or religious slur is offensive. For example, in *Colker v. Connecticut Fire Ins. Co.*, 7 S.W.2d 502, 505 (Ky. 1928), trial counsel described in closing arguments his opposition and his actions as "a dirty nasty Jewish trick" and a "criminal who tried to cheat the government, and now trying to cheat the fire insurance companies by a

26

dirty Jew trick." The Court roundly condemned the argument as an "appeal to race prejudice." *Id.*

Nevertheless, the use of a party's proper and legal name, rather than nickname, was clearly a matter within the trial court's discretion, and if Nami did not inform the trial court that he was offended, we would not expect the trial court to assume the offense that Nami apparently chose to ignore.

Within the context of the palpable error rule, we are satisfied that these matters provide Nami no grounds for relief from the judgment.

## B. Alleged Evidentiary Errors

Nami alleges that the trial court made two erroneous evidentiary rulings in connection with the trial proceedings: 1) excluding Nami's evidence of Asher's efforts to terminate the leases, and 2) excluding evidence concerning Nami's offer to provide access to its books and records.

### 1. Exclusion of Asher's claim to terminate the leases

Asher's original complaint in this action included a count seeking to terminate the leases, thereby freeing Asher to negotiate new leases for its gas reserves. In response, Nami filed a counterclaim alleging that Asher had breached its obligations under the leases by seeking the termination of the leases without justification. The trial court dismissed Asher's claim for termination of the leases by summary judgment prior to trial. In light of the dismissal, the trial court granted Asher's pretrial motion to exclude evidence of the fact that Asher had originally brought the termination claim.

27

Nami asserts that Asher's attempts to terminate the leases throughout the course of this litigation is the foundation of its counterclaim, and the exclusion of Asher's claim to terminate the leases substantially undercut its counterclaim. Despite the trial court's pretrial ruling, on several occasions during the trial, Nami was able to show that Asher had undertaken energetic efforts to terminate the leases and that its claim to do so had been dismissed before trial. Nami could not have been prejudiced by the trial court's ruling, because in derogation of the ruling, the matter was repeatedly presented to the jury throughout the trial proceedings. Consequently, based upon the wide-spread violation of the trial court's pretrial ruling, any error in the ruling was rendered harmless.

## 2. *Exclusion of evidence concerning Nami's offer to provide access to its books and records*

Nami also contends that the trial court improperly excluded evidence that it offered to grant Asher access to its books and records relevant to its integration charts, production records, operation records, and sales records pertaining to Asher's wells. However, that offer was made in a letter from Nami to Asher's Board of Directors, conveying Nami's openness to a settlement and compromise to end the litigation. It was apparent to the trial court that the offer was a statement made in compromise negotiations, and therefore, was excludable under KRE 408.

KRE 408 ("Compromise and Offers to Compromise") provides that

Evidence of:
(1) Furnishing or offering or promising to furnish; or

28

(2) Accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The purpose of KRE 408 is to permit settlement negotiations to proceed forthrightly. *Cabinet for Health & Family Services v. Chauvin*, 316 S.W.3d 279, 303 (Ky. 2010) (Scott, J., concurring).

Nami complains that the trial court's ruling unfairly hampered Nami's ability to negate Asher claims that it was unable to access Nami's books and records pertaining to the royalty calculations. We are satisfied that Nami had ample opportunity to demonstrate its transparency with its accounting books and records without resorting to the letter issued in its effort to facilitate a settlement. We find no error in the trial court's ruling.

## C. Interrogatory No. 10 Pertaining to Nami's Breach of Contract Counterclaim against Asher Was Not Improper

As noted above, in response to Asher's lawsuit, Nami filed a counterclaim alleging that Asher was in breach of the leases by frustrating Nami's efforts to drill additional wells on the Asher property. Nami contends that it should have been granted a new trial on that claim because the trial court's instruction on the relevant lease provisions, Interrogatory No. 10, was unduly confusing. Interrogatory No. 10 stated as follows:

State whether the jury is satisfied from the evidence:

(1) That [Nami] tendered to [Asher] one or more proposed drilling plans containing a description of the location of proposed wells on the leased premises;

(2) That [Asher] rejected or prohibited the proposed drilling plan(s);

AND

(3) As to one or more of the following:

a. The drilling plan would not have rendered a material portion of the coal reserves on the leased premises unmineable;

b. The affected coal reserves, if any, could not have been practicably mined at the time of the tender of the drilling plan(s);

OR

c. That [Asher] failed to, within thirty (30) days after it received the drilling plan(s), provide sufficient documentation and evidence to [Nami] by which an unbiased party knowledgeable in coal mining could reasonably conclude that mineable coal reserves underlay the leased premises.

The jury answered "no" to this interrogatory, thereby finding against Nami on its counterclaim. Nami contends that the interrogatory is confusing because it required the jury to decide the undisputed factual matter that Nami proposed "one or more drilling plans." Nami also complains that the interrogatory asked the jury to find "one or more of the following" factors, rather than simply "one of the following" factors.

We note that during the trial court's review of the proposed jury instructions, Nami made no complaint about the substance or phrasing of Interrogatory No. 10, and its trial counsel appeared to be in agreement with it. Thus, the trial court was given no opportunity to reconsider or redraft the

30

interrogatory. A party may not on appeal assign error to the giving of an instruction "unless he has fairly and adequately presented his position by an offered instruction or by motion, or unless he makes objection before the court instructs the jury, stating specifically the matter to which he objects and the ground or grounds of his objection." CR 51(3).

As evidence that Interrogatory No. 10 was confusing, Nami points out that the jury during its deliberations sent a note to the judge asking for clarification. The note asked: "On Interrogatory No. 10, we do not fully understand the questions?" Nami does not mention a second question submitted by the jury soon after the first, asking: "What is the difference between a plot and a plan?" The trial court declined to answer the questions and Nami makes no claim of error in that decision. The Court of Appeals concluded that the jury actually withdrew the first question from consideration by the trial court.

In its post-trial rulings, the trial court observed that "[t]he question submitted by the jury [did] not indicate confusion about what the instructions required the jury to do; rather, it indicat[ed] that the jury was performing its duty, attempting to determine whether Nami tendered a 'drilling plan.'" Upon review, we do not believe Interrogatory No. 10 is confusing or that it had any propensity to mislead or misinform the jury; certainly, we see no palpable error in the instruction or manifest injustice arising from its use so as to warrant relief despite the failure of Nami to object. Accordingly, we affirm the Court of Appeals' determination that no error was committed.

31

## VIII.  ASHER'S CROSS-APPEAL

In addition to its claim that Nami's post-trial motions were time barred, Asher also claims on cross-appeal that the trial court erred by denying its motion to amend its complaint to assert the additional claim that Nami had committed trespass by improperly extracting natural gas from an area of Asher's property that was not subject to the leases.

In Count IV of its fifth complaint, Asher originally alleged that Nami had drilled Well #35 in violation of the spacing requirements imposed by KRS 353.610(2).[11]  As a result of the spacing violation, the site encroached upon an adjacent parcel of land known as the "Carlson Tract" which was not subject to any of Nami's leases.  This placement of Well #35 appears to have been due to an alleged erroneous survey conducted on behalf of Nami and subsequently approved by Asher.  Upon discovering the error, Asher alleged that Well #35 was drawing gas from beneath the Carlson Tract.  Accordingly, Count IV of Asher's complaint alleged that Nami exercised dominion and control over the gas underneath the Carlson Tract and claimed that Nami's appropriation of that gas constituted conversion.  In defense, Nami argued that under the common law rule of capture, Asher could not prove conversion.

---

[11] Except as provided in KRS 353.500 to 353.720, no permit shall be issued for the drilling, deepening or reopening of any shallow well for the production of gas unless the proposed location of the well shall be at least five hundred (500) feet from the nearest mineral boundary of the premises upon which such well is to be drilled, deepened or reopened; and, the proposed location must be at least one thousand (1,000) feet from the nearest gas producing well.  This subsection shall not be construed to regulate the distance between wells which do not produce gas from the same pool.

The trial court granted summary judgment for Nami, dismissing Asher's conversion claim.

Asher then moved for leave to amend its fifth complaint, to reassert what was essentially the same conversion claim relabeled as trespass. The trial court denied the amendment, stating that "[Asher] has unduly delayed requesting leave to assert its [trespass] claim and allowing an amendment at this advanced stage of the litigation would prejudice Defendant [Nami]."

CR 15.01 provides that leave to amend "shall be freely given when justice so requires." Further, Kentucky law "favors the right of litigants to have their rights disposed of on the merits rather than technicalities," and therefore courts have broad discretion in permitting amendments or other reasonable changes in pleadings. *Kentucky Home Mutual Life Insurance Co. v. Hardin*, 126 S.W.2d 427, 431 (Ky. 1938). As such, the decision to grant or deny leave to amend is ultimately left to the discretion of the trial court, which will not be disturbed absent an abuse of that discretion. *Kenney v. Hangar Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 869–70 (Ky. App. 2007).

Asher's motion to amend its fifth complaint to assert a trespass claim came after five years of litigation, five complaints, fourteen months after the final deadline to amend the pleadings, six months after Asher announced it was ready for trial, and only two months prior to the start of the trial itself. Under these circumstances, we agree that the trial court was well within the scope of its sound discretion in denying Asher's motion to amend its complaint

again so as to assert a trespass claim in place of its failed conversion claim. We affirm the Court of Appeals.

## IX. CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the opinion of the Court of Appeals. We affirm the Court of Appeals' opinion insofar as it upholds the trial court's award of compensatory damage in the sum of $1,308,403.60. However, we reverse the Court of Appeals with respect to the award of punitive damages, and accordingly, we vacate that portion of the judgment of the Bell Circuit Court. We remand to the trial court for entry of a judgment consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANTS/CROSS-APPELLEES:

Michael D Bowling
1217 E. Cumberland Ave., Suite 3
P.O. Box 130
Middlesboro, KY 40965

Benjamin Todd Keller
Donald Joseph Kelly
Virginia Hamilton Snell
Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street, Suite 2800
Louisville, KY 40202

COUNSEL FOR APPELLEES/CROSS-APPELLANTS ASHER LAND AND
MINERAL, LTD:

Michael J. Gartland
Delcotto Law Group, PLLC
200 North Upper St.
Lexington, KY 40507

James C. Helton
Helton and Helton
P O Box 1070
Pineville, KY 40977

Darrell L. Saunders
700 Master Street
P.O. Box 1324
Corbin, KY 40702

COUNSEL FOR APPELLEES/CROSS-APPELLANTS VANGUARD NATURAL
GAS, LLC:

Mason L. Miller
Miller Wells, PLLC