RENDERED:  APRIL 3, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1424-MR
AND
CROSS-APPEAL NO. 2024-CA-1438-MR


ABBOT REALTY CORP. D/B/A
ABBOT REALTY & AUCTION
A/K/A CENTURY 21 ABBOT
REALTY & AUCTION; AND
ROBERT DORGAN     APPELLANTS/CROSS-APPELLEES


     APPEAL FROM SHELBY CIRCUIT COURT
v.    HONORABLE MELANIE H. BRUMMER, JUDGE
     ACTION NO. 17-CI-00005


BILL NATION, EXECUTOR
OF THE ESTATE OF HAROLD
NATION     APPELLEE/CROSS-APPELLANT


OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING APPEAL
NO. 2024-CA-1424-MR; REVERSING CROSS-APPEAL NO. 2024-CA-1438-
MR

** ** ** ** **

BEFORE:  CALDWELL, L. JONES, AND TAYLOR, JUDGES.

JONES, L., JUDGE:  These appeals involve Robert Dorgan's refusal to compensate the estate of his deceased salesperson, Harold Nation, for a sale Harold facilitated for Dorgan's company prior to Harold's passing in February 2016.  In Appeal No. 2024-CA-1424-MR, the above-captioned appellants/cross-appellees (collectively "Dorgan") contest a January 5, 2024 judgment of the Shelby Circuit Court that, in conformity with a jury verdict, awarded Harold's estate (the above-captioned appellee/cross-appellant, hereinafter "Nation") $45,825 in damages for breach of contract, one dollar in damages for conversion, and $410,000 in punitive damages.  As set forth below, we affirm that judgment in part and reverse it in part.  Nation, in Cross-Appeal No. 2024-CA-1438-MR, also contests the trial court's refusal to grant him prejudgment interest.  As set forth below, we reverse.

## I. APPEAL NO. 2024-CA-1424-MR

Dorgan's appeal contests the legal veracity of Nation's conversion and punitive damages claims, as well as what Nation was awarded for those claims.  Dorgan also takes issue with several of the trial court's evidentiary rulings.

## A. CONVERSION AND PUNITIVE DAMAGES

Dorgan presents several arguments relating to why, in his view, the circuit court erred in granting Nation awards for compensatory and punitive damages.  However, the most critical issue Dorgan has preserved[1] in this vein is

---

[1] Dorgan raised this point in directed verdict and post-judgment motions.

whether the "economic loss doctrine," as adopted in Kentucky, precluded Nation from asserting conversion and punitive damages claims in conjunction with his breach of contract claim. This is an issue of law. As such, we review it *de novo*. *See Kentucky Farm Bureau Mut. Ins. Co. v. Blevins*, 268 S.W.3d 368, 372 (Ky. App. 2008). It is also an issue that, before we delve into its substance, requires a measure of context – much of which is provided by Nation's operative complaint (*i.e.*, the second amended complaint Nation filed on March 9, 2021) and the instructions that were ultimately submitted to the jury. In relevant part, Nation's complaint provided:

> 5. That on May 4, 2008[,] Defendant, Century 21 Abbot Realty, by and through, broker and Defendant, Robert Dorgan, did enter into a Broker-Salesman Contract with the decedent Harold Nation.
>
> 6. That pursuant to the terms of that contract, Harold Nation was to work diligently to sell, lease or rent real estate listed with the Broker.
>
> 7. That the usual and customary commissions would be charged for services performed at rates agreed upon by the parties.
>
> 8. That division and distribution of the earned commissions paid to or collected by the Broker is to take place as soon as practicable after collection of such commissions from the party or parties for whom the services may have been performed.
>
> 9. That according to the customary practices and agreement of Harold Nation and the Defendants, in 2015

and thereafter, Harold Nation's division of commissions earned was 70.5%.

9. [sic] The decedent, Harold Nation, did enter into a Multiple Listing Contract as an agent for Century 21 with the Tobacco Road Farms, LLC, for 305 acres on Mt. Eden Road, Shelbyville, Kentucky 40065, PIN 053-00-029, 053-00-040, 063-00-001, with terms that included commission was to be paid at 5% of the sale price and was earned upon acceptance of an offer.

10. That the decedent, Harold Nation was also the agent of the purchaser, The David Howard Fenley Living Trust;

11. On or about October 22, 2015, The David Howard Fenley Living Trust did offer to purchase the 305 acres on Mt. Eden Rd., in Shelbyville, Kentucky, identified above, and the owner, Tobacco Road Farms, LLC, did accept that offer. The parties formalized their agreement in a Uniform Sales and Purchasing Contract.

12. The decedent did all of the necessary work to complete the contract for sale of said property;

13. The decedent died on February 15, 2016;

14. The closing on the property occurred on March 29, 2016;

15. Robert Dorgan attended the closing and collected a commission of $65,000.00;

16. Demand has been made by the estate for the division and distribution of the commission to Defendants, which has been refused;

## CAUSE OF ACTION I – BREACH OF CONTRACT

17. Plaintiff re-alleges and re-avers all of the allegations set forth herein above as if restated fully herein below, and for Count I of its Second Amended Complaint states as follows:

18. Nation and Defendants entered into a valid, written contract entitled Broker-Salesman Contract, on May 5, 2008;

19. The contract was in full force and effect on the date of the contract for the sale of the Tobacco Road Farm;

20. Pursuant to the terms of the Uniform Sales Contract, the commission of the sale was earned upon acceptance of the offer;

20. [sic] By the deliberate and intentional act of the Defendants, Defendants breached the terms of the Broker Salesman Contract by denying Plaintiff the division and distribution of the commissions earned by Harold Nation at the time the commission was received pursuant to the terms of the contract;

21. As a direct and proximate result of the breach of the contract by Defendants, Plaintiff has incurred damages in an amount in excess of the minimum amount for subject matter jurisdiction of this Court, to be proven at trial;

## CAUSE OF ACTION II – CONVERSION AND CIVIL THEFT

22. Plaintiff re-alleges and re-avers all of the allegations set forth herein above as if restated fully herein below, and for Count II of its Second Amended Complaint states as follows:

23.  Harold Nation had a legal right to his commission from the sale of the property having performed his duties under the Broker-Salesman Contract;

24.  Defendants in gross disregard for human decency and in breach of their contract with Nation denied Nation's estate from the right of possession of Nation's commission;

25.  Defendants exercised dominion over the commission in a manner that denied and continues to deny Plaintiff's right to use and enjoy the division, all to Defendant's own use and beneficial enjoyment;

26.  Defendants have acted intentionally to interfere with Plaintiff's possession of its division of the commission;

27.  Plaintiff has made demand for the distribution of the Plaintiff's division of the commission from Defendants, and said request has been refused;

28.  The Defendants' acts are the actual and legal cause of Plaintiff's loss;

29.  As a direct and proximate result of the Defendants' conversion of the division, Plaintiff has suffered damage by the loss and continued loss of the use and enjoyment of the division of the commission in an amount in excess of the minimum amount for subject matter jurisdiction of the Court, to be proven at trial[.]

Record at 499-502 (citations to referenced exhibits omitted).

As the above indicates, Nation's claims of conversion and breach of contract were *both* dependent upon Dorgan's alleged breach of a contractual duty to pay Nation compensation commensurate with a 70.5% division of the $65,000 commission Dorgan received from the sale of the Mt. Eden property, which is

$45,825. Likewise, after these claims were submitted to the jury following trial, the jury was instructed to assess, in the context of *both* claims, whether Dorgan breached a duty to pay Nation what was owed by virtue of their contract. Specifically, the breach of contract instructions provided:

### INSTRUCTION NO. 3
### Breach of Contract

If you are satisfied by a preponderance of the evidence that:

1. That the Plaintiff entered into a valid contract titled Broker-Salesman Contract with the Defendants Century 21 and Mr. Dorgan on May 5, 2008; and

2. That said Contract entitled the Plaintiff to a portion of the commission upon completion of the sale of the Property; and

3. That the Plaintiff earned a portion of the commission; and

4. That Defendants Century 21 and Mr. Dorgan failed to give the Plaintiff the commission that the Plaintiff earned under the Contract; and

5. That the Plaintiff suffered damages when the Defendants Century 21 and Mr. Dorgan failed to give the Plaintiff the commission he earned under the contract,

Then you will find for the Plaintiff and proceed to Verdict Form No. 1. If you are not satisfied by the evidence, you will find for the Defendants and proceed to Verdict No. 2.

Record (R.) at 1060.

-7-

"Verdict Form No. 1" – which the jury was instructed to utilize only if they found in Nation's favor on the breach of contract claim – directed the jury to award "Damages, not to exceed $45,825.00," that is the full amount of what Nation alleged in his complaint he was entitled to contractually receive of the commission. Further, the jury was directed to "return to Jury Instruction 5" (set forth below) *only* if they awarded Nation those contractual damages. *See* R. at 1065. By contrast, "Verdict Form No. 2" – which the jury was instructed to utilize if they did not find in Nation's favor on the breach of contract claim – directed the jury *not* to consider Jury Instruction 5. *See* R. at 1066.

In turn, "Jury Instruction 5" delineated Nation's conversion claim – a claim that sought only nominal damages:

### INSTRUCTION NO. 5
#### Conversion

You will find for Plaintiff if you are satisfied by clear and convincing evidence:

1. That the Plaintiff had legal title to a portion of the Commission; and

2. That the Plaintiff had possession of that portion of the Commission at the time of the conversion or the right to possess that portion of the Commission at the time of the conversion; and

3. That the Defendants Century 21 and Mr. Dorgan exercised dominion over that portion of the Commission in a manner which denied the Plaintiff's rights to use and enjoy that portion of the Commission; and

-8-

4. That the Defendants Century 21 and Mr. Dorgan used that portion of the Commission for its own use and beneficial enjoyment; and

5. That the Defendants Century 21 and Mr. Dorgan intended to interfere with the Plaintiff's possession of that portion of the Commission; and

6. That the Plaintiff made some demand for that portion of the Commission; and

7. That the Defendants Century 21 and Mr. Dorgan refused to return said portion of the Commission; and

8. That the Defendants Century 21 and Mr. Dorgan's acts were the cause of the Plaintiff's loss of that portion of the Commission; and

9. That the Plaintiff suffered damage by the loss of that portion of the Commission.

If you find for the Plaintiff, you will proceed to Verdict Form No. 5. . . .

### VERDICT FORM NO. 5
### Conversion

We, the Jury, find for the Plaintiff, under Instruction No. 5, and award it the following nominal damages:

_____

Damages, not to exceed $1.00.

R. at 1062 and 1069.

The jury ultimately awarded Nation $45,825 for breach of contract, and $1 in "nominal" damages for conversion. The "nominal" damage award for

conversion was, in turn, the sole predicate specified in the instructions for directing the jury to proceed to "**INSTRUCTION NO. 6 Punitive Damages**." *See* R. at 1063 and 1069. And, after proceeding to that instruction, the jury then awarded Nation punitive damages against Dorgan in the amount of $410,000.

With that context in mind, we turn to whether the "economic loss doctrine" precluded Nation from asserting conversion and punitive damages claims in conjunction with his breach of contract claim, and we begin our analysis with a brief review of what constitutes "breach of contract" and "conversion." Generally, a plaintiff must establish three things to prove a breach of contract claim: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from that breach. *Barnett v. Mercy Health Partners–Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). In a breach of contract action, the measure of damages "is that sum which will put the injured party into the same position he would have been in had the contract been performed." *Id*. at 727-28. A breach of contract typically does not permit an award of punitive damages. *See Nami Res. Co., LLC v. Asher Land & Min., Ltd.*, 554 S.W.3d 323, 335 (Ky. 2018). By contrast, punitive damages can be recoverable for a tort claim such as conversion. *See Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 854 (Ky. App. 2014). To prove a claim of conversion, a plaintiff must establish the following:

(1) the plaintiff had legal title to the converted property;

(2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;

(3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;

(4) the defendant intended to interfere with the plaintiff's possession;

(5) the plaintiff made some demand for the property's return which the defendant refused;

(6) the defendant's act was the legal cause of the plaintiff's loss of the property; and

(7) the plaintiff suffered damage by the loss of the property.

*Jones*, 454 S.W.3d at 853 (citations omitted).

Considering their respective elements of proof, one can imagine any number of scenarios where a breach of contract and conversion claim might overlap. And to be clear, "a breach of contract action and a claim for conversion are not necessarily incompatible[.]" *Id*. at 853-54. However, "[t]he failure to perform a contractual obligation typically does not give rise to a cause of action in tort[.]" *Mims v. Western–Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. App. 2007) (internal quotation marks and citation omitted). Furthermore, a failure to pay money that is owed, standing alone, cannot be considered tortious because:

The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of

-11-

a promise.  Otherwise, the failure to meet a note, or any
other promise to pay money, would sustain an action in
tort for negligence, and thus the promisor be made liable
for all the consequential damages arising from such
failure.

*Dice's Adm'r v. Zweigart's Adm'r*, 161 Ky. 646, 171 S.W. 195, 197 (1914)

(quoting *Tuttle v. George H. Gilbert Mfg. Co.*, 13 N.E. 465, 467 (Mass. 1887)).

In other words, more is required for these claims to coexist in the

same action, such as "[a] breach of a duty *arising independently* of any contract

duties between the parties[.]"  *Nami*, 554 S.W.3d at 336 (emphasis in original).

Furthermore, these claims cannot coexist where "the economic losses

arising from the breach of contract [are] fully recoverable" through a breach of

contract action, and the plaintiff "d[oes] not show that he sustained tort damages or

a loss independent of the contract damages."  *Jones*, 454 S.W.3d at 854.  That was

the case in *Jones*; and because of it, we held that the trial court in that matter did

not err by refusing to award the plaintiff compensatory and punitive tort damages

for conversion in addition to contractual damages.  *Id*.  This was essentially an

application of the "economic loss doctrine."  The doctrine was also applied and

formally recognized in *Nami*, *supra*.  There, as the Kentucky Supreme Court

explained, the plaintiff was properly denied compensatory and punitive damages

for alleged fraud associated with the breach of a gas royalty contract because the

plaintiff "was made whole through its award for unpaid royalties" and "[i]t

-12-

assert[ed] no compensable injury beyond its claim for unpaid royalties" nor did it allege "misconduct by [the defendant] other than the conduct of breaching the contract." *Nami*, 554 S.W.3d at 336.

In Kentucky, the "economic loss doctrine" prohibits recovery for tort claims "where the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract." *Nami*, 554 S.W.3d at 335 (internal quotation marks omitted). The doctrine ensures that the "law of contract" and "the law of torts" do not "dissolv[e] one into the other." *Id*. (citation omitted). Thus, a plaintiff can only "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Id*. Accordingly, where the tort claim and its associated damages are indistinguishable from the breach of contract claim, the plaintiff cannot recover for the tort claim. *Id*. at 336.

To be sure, neither *Jones* nor *Nami* involved the kind of contract at issue here. However, in *Nami*, the Kentucky Supreme Court analyzed this issue broadly enough to encompass it, explaining "the rule in Kentucky" is that "when a plaintiff may obtain complete relief for his contractual losses by means of compensatory damages under a breach of contract claim," then "he may not simultaneously recover punitive damages after being made whole on his contractual damages." *Nami*, 554 S.W.3d at 336. The Court explained a party

-13-

may assert an independent claim for fraudulent or malicious conduct associated with the breach of contract *only* if that conduct resulted in "damages that differ from the damages sustained by reason of the breach of contract[.]" *Id*. (emphasis added).

Here, Nation did not allege or otherwise demonstrate harm above and beyond a broken contractual promise. The only damage Nation claims he suffered was the nonpayment of $45,825 – what he asserted was *contractually* owed. He was awarded all of that under his breach of contract claim. That award made Nation whole. True, Nation asserted that Dorgan's prolonged refusal to pay him was baseless and malicious, but the economic loss doctrine applies "even when the breach is motivated by malice and accomplished through fraud[.]" *Id*. Nation also attempted to distinguish his "conversion damages" from his "breach of contract damages" through the artifice of a one-dollar nominal damages award. However, Nation's complaint and the jury instructions both underscored that *but for* the breach of contract, that nominal damages award could never have existed; and in any event, lending credence to such a "nominal damages" artifice in this context would effectively eviscerate our Supreme Court's pronouncement that a plaintiff who obtains complete relief for his contractual losses in a breach of contract claim may not simultaneously recover tort-related punitive damages after being made whole on his contractual damages. *Id*. at 336.

-14-

In sum, Nation asserted no breach of any "duty" independent from his breach of contract action; he simply repackaged a contractual duty into a predicate for a tort claim. His conversion claim, and his accompanying punitive damages claim that was wholly dependent upon it, were therefore barred by Kentucky's economic loss rule and should have been dismissed. Accordingly, we reverse to this extent and remand.

## B. EVIDENTIARY ISSUES

We review a trial court's evidentiary rulings under the abuse of discretion standard. *See Engles v. Commonwealth*, 373 S.W.3d 456, 457 (Ky. App. 2012). An improper evidentiary ruling cannot warrant reversal if it only results in harmless error. *See* Kentucky Rule of Civil Procedure ("CR") 61.01. On appeal, Dorgan argues the trial court abused its discretion with respect to three evidentiary rulings: (1) admitting his entire deposition into evidence and then permitting the jury to have his deposition with them during deliberations; (2) admitting the report of Nation's expert witness into evidence and then permitting the jury to have the report with them during deliberations; and (3) failing to exempt Nation's expert witness from the requirements of sequestration.

For purposes of our review, we will limit our analysis of Dorgan's arguments to whether these perceived errors were something more than harmless – the crux of the trial court's rulings with respect to each of these perceived errors

was that none of them were more than harmless. The two points connecting these perceived errors together are Dorgan's contentions that none of them were harmless because in his view: (1) this evidence likely caused the jury to give undue weight to Nation's contention that Harold was owed compensation from Dorgan at a rate equivalent to 70.5% of the commission received for the Mt. Eden transaction; and (2) this evidence likely inflamed the jury's prejudice and caused it to award Nation an unfairly large amount of punitive damages.

That latter point is a moot one: We have already held that Nation's conversion and punitive damages claims were not legally tenable; accordingly, it is irrelevant whether these complained-of evidentiary rulings inflamed the jury's prejudice and caused it to award Nation an unfairly large measure of punitive damages. Instead, we will focus only upon the former point, *i.e.*, whether this evidence likely caused the jury to give undue weight to Nation's contention that it was owed compensation from Dorgan at a rate equivalent to 70.5% of the commission received for the Mt. Eden transaction.

**1. Admitting Dorgan's entire deposition into evidence and then permitting the jury to have his deposition with them during deliberations was at most harmless error**.

Some additional background is necessary to address this issue. The "broker-salesman contract" Harold executed with Dorgan included two provisions that have been central to this dispute from the outset:

-16-

7.  The usual and customary commissions shall be
charged for any service performed hereunder at rates
agreed upon by the parties.

8.  The division and distribution of the earned
commissions as set out in Paragraph 7 hereof, which may
be paid to or collected by the Broker shall take place as
soon as practicable after collection of such commissions
from the party or parties for whom the services may have
been performed.

In other words, the contract provided Harold was entitled to a

"division and distribution of the earned commissions," but it was silent regarding

what that "division" was.  Consequently, the parties relied upon course of dealing

evidence to supply the missing term.  Nation, as indicated, alleged in the complaint

that Harold was entitled to compensation equivalent to a 70.5% division of the Mt.

Eden commission.  Nation asserted that figure was consistent with Harold's course

of dealing with Dorgan.  Dorgan, on the other hand, denied that allegation in his

answer and claimed *prior to trial* that Harold and all of Dorgan's other salespeople

who had signed the same contract as Harold were never entitled to any set rate of

compensation; and that pursuant to their courses of dealings their compensation

was always decided on a "transaction by transaction" or "sale by sale" basis

dependent upon "participation" and whether that salesperson – as opposed to some

other salesperson – "completed the transaction."  Dorgan also emphasized that

claim throughout his 104-page deposition of October 16, 2018.  Indeed, that claim

was the focus of almost the *entirety* of his deposition.  Here are some illustrative

examples:

> Q: In that contract, there's no mention of a split of the commission by percentage.  How would you all determine that division of the commission?
>
> DORGAN: There was no set agreement.
>
> Q: So would you make that decision on a transaction by transaction basis?
>
> DORGAN: Yes.
>
> Q: And how would that come about?
>
> DORGAN: Based on the participation.
>
> Q: What do you mean?
>
> DORGAN: Participation that the agent put in.
>
> . . .
>
> Q: Your 12 agents right now do you believe that they operate under an assumption that they are entitled to a certain percentage of the commission that they earn through their sales?
>
> DORGAN: No, I don't.
>
> Q: They're all just on a transaction by transaction basis?
>
> DORGAN: All the listings are mine.  We work, if they complete the transaction, we work accordingly.
>
> Q: And so are you saying that they don't know how much they earn?

DORGAN: When they receive their check.

Q: They don't have any idea before that time?

DORGAN: *Each agent is on an agent by agent basis*.

Q: Okay. You said that each one was paid according to transaction by transaction. I'm asking does an agent have an expectation as to what their division of the commission would be?

DORGAN: There is no set amount.

. . .

Q: And so per agent each agent has no idea what you'll pay them for their percentage –

DORGAN: There is no set amount.

Dorgan Deposition at 6-10 (emphasis added).

Q: Now Mr. Dorgan, can you agree that in 2015 Mr. Nation received between 70.5 percent and 72 percent of the gross commissions paid to Century 21?

DORGAN: On, each agent is paid on a case by case basis, and Harold was on individual sales basis.

Q: That is not an answer to the question that I asked. In 2015 was Mr. Nation paid a percentage of the gross commission ranging between 70.5 percent and 72 percent?

DORGAN: The commission payment that Mr. Nation –

Q: Mr. Dorgan, yes or no?

DORGAN: – was never a set amount.

Q: Was he paid between 70.5 percent and 72 percent on each of the sales in 2015?

. . .

DORGAN: There was not a set rate that he was paid.

Dorgan's Deposition at 62-63.

Despite claiming that his course of dealing with Harold and his other salespeople supported that a given salesperson's compensation was dependent upon "participation," however, Dorgan could not provide any supportive examples during either his deposition or trial testimony. Additionally, Dorgan pulled a sudden "about-face" from his deposition testimony when he testified, at trial, about *the set rate of roughly 70% that Harold actually did receive throughout 2015*:

Q: In [the broker-salesman contract], is there a set percentage of the commission that an agent would receive?

DORGAN: There is not.

Q: Why?

DORGAN: *Each agent in the office*, as in most offices, *is at their own set commission rate* because different agents are more experienced than others, been in the business longer, better able to work on their own with less supervision. So, there are various reasons for various *commission levels*.

Q: Did this contract authorize Harold Nation to procure listings on behalf of Abbot Realty?

DORGAN: It did.

-20-

Q: Were there any other written agreements, memorandums, or addendums to this contract?

DORGAN: No, ma'am.

Q: Can you read paragraph 7 please?

DORGAN: Would you like me to read it out loud?

Q: Please.

DORGAN: Number seven. The usual and customary commission shall be charged for any service performed hereunder at rates agreed upon by the parties.

Q: Now, that's charged to the client, right?

DORGAN: Right.

Q: Okay. And then paragraph 8, please?

DORGAN: Eight. The division and distribution of earned commissions as set out in paragraph seven hereof, which may be paid to or collected by the broker, shall take place as soon as practicable after collection of such commissions from the party or parties for whom the services may have been performed.

Q: *Did Mr. Nation have a percentage of commission that he historically received for sales on which he was an agent?*

DORGAN: *He did.*

Q: *What was that?*

DORGAN: *It was roughly 70 percent.*

Video Record (V.R.), September 6, 2023, at 1:08:47-1:10:41 p.m. (emphasis added).

Q: In this deposition, when I asked you if you would make the decision on a transaction by transaction basis, you said "yes." And the question was, "how would that come about," and your answer was "based on the participation." Was that the question asked and your answer given?

DORGAN: Yes.

Q: Thank you. When I asked you what did you mean by that, you said "participation of the agent put in." Was that the question asked and your answer given?

DORGAN: Yes.

Q: And earlier today, *I asked you if the agents had a set percentage of a commission that they received, and you replied that they did. Is that correct?*

DORGAN: *Yes*.

Q: If you look on the deposition on page eight, I asked you about whether or not the agents had a belief that you would pay them, and you responded yes.

. . .

"Do they just act in their belief that you will pay them," and your response was "yes." Was that the question I asked and the answer given?

DORGAN: Yes.

Q: And then I asked, "but with no idea about how much that would be," and you responded "it's on a sale by sale." Was that the question asked and the answer given?

DORGAN: Right.  Because each sale was completed by different agents in the office, and *they're at different commission rates*.

Q: And then again, on line 24, I questioned you again, and I asked, "They have no idea what the percentage of that commission would be?" And you responded at the top of page 9, line 2, "There's no set amount." Was that the question asked and the answer given?

. . .

The question was, "So sale by sale, and no other written communication between you, they have no idea what the percentage of that commission would be."  And your response was, "There's no set amount.  Was that the question asked and the answer given?

DORGAN: That was the answer, and the gist of it was that each agent has a separate sales commission because they're all at *different levels*.

Q: On page 10, line 12, the question was, "Mr. Dorgan, when you sit down with each one of your agents and discuss the percentage of fees per transaction," and you respond "yes," and I ask, "Yes, okay, and when do you do that, Mr. Dorgan?" And your response was "after the transaction is completed."  Was that the question asked and your answer given?

DORGAN: Yes.

Q: Today, though, you've testified that the agents *do have a percentage* that they *expect* to receive on the commission.  Is that true?

DORGAN: Each agent has their own amount that they receive.  *Yes*.  It varies based on their experience.

Q: On the top of page 17, the question was "the average of all the properties listed in here is – "

DORGAN'S COUNSEL: Sorry counsel. One second.

Q: Sure. I'm sorry. It's line 1. "The average of all the properties listed in here is 69% Mr. Dorgan." And at this time we're talking about pre-2013 closings. And I asked you, "Did you have an arrangement with Mr. Nation to pay him 69% of the commission reflected by your office?" And your answer was, "there was no set rate." Was that the question asked and your response given?

DORGAN: I recall we were paying Harold roughly that amount, but this question *I thought* was in terms of the *agents in the office. Each agent is at a different rate and level based on their experience in the real estate business.*

V.R., September 6, 2023, at 1:18:32-1:24:26 p.m. (emphasis added).

With the above in mind, we now turn to the specifics of why, in Dorgan's view, the admission of his deposition into evidence influenced the jury to find in favor of Nation regarding Nation's breach of contract claim. In his words:

> [T]he deposition testimony is a lengthy and adversarial quarrel, where Dorgan largely refuses to submit to Mrs. Whitten's (deposing counsel) beratement and insistence that Nation was unequivocally owed 70.5% of commission for the transaction in dispute.

Dorgan's Br. at 17-18.

> After reading the length and volume of the transcript, the jurors likely disregarded most – if not all – of their recollection of Dorgan's spoken words and instead unduly emphasized the written words readily before them.

-24-

*Id.* at 19.

As for his "spoken words" that Dorgan believes the jury "likely disregarded" due to their possession of his deposition, Dorgan then points to one sentence of testimony he gave at trial: "There was, as I mentioned before, no set percentage, as *each agent is at a different rate*, and these did vary a bit over the years with Mr. Nation." V.R., September 6, 2023 at 1:51 p.m. (emphasis added). Dorgan also adds that because he stated on page 8 of his deposition that "Each agent is on an agent by agent basis," his deposition was *consistent* with his trial testimony. *See* Dorgan's Br. at 22.

In fairness, a substantial part of Dorgan's argument regarding the "harm" caused by the jury's possession of his deposition was, as indicated earlier, directed toward how he believed it also influenced the jury's conversion and punitive damages awards – he asserts it was used to paint him as untruthful, malicious, and deserving of tort damages. As stated, those are moot points. Stripped of those contentions, however, what remains of Dorgan's argument regarding "harm" – as it relates to Nation's breach of contract claim – is difficult to follow.

To start, Dorgan's lone sentence of deposition testimony that "Each agent is on an agent by agent basis" did not have the effect of squaring his deposition testimony with his trial testimony. In his deposition, Dorgan repeatedly

-25-

denied that *any* of his salespeople had *any* expectation of being paid *anything* until the moment he told them – after the sale closed – *what they would get*. At trial, by contrast, he repeatedly testified that *all* his salespeople *expected* to be paid at a *set* individualized *rate* for their sales. Further, he testified *Harold had a set rate that was based upon his level of experience*; that he was compensating Harold at a *rate* equivalent to roughly 69% of commissions received from his sales pre-2013; and that more recently in 2015, Harold was compensated at a *rate* of *roughly 70%*.

Recall that during his deposition, Dorgan was also presented with course of dealing evidence indicating that in each of the sales Harold made in 2015, Harold received compensation equivalent to a range between 70.5 percent and 72 percent of the gross commissions paid. That same evidence was presented at trial. As "Verdict Form No. 1" tends to indicate, Nation only requested compensation consistent with the lower of those two "roughly 70%" amounts. Furthermore, Dorgan was asked during his deposition to provide examples supporting the existence of a course of dealing wherein he would *lower* the expected rate of his salespersons' compensation based upon their "participation." He could not do so at his deposition, nor could he do so at trial.

With that in mind, we are left to guess at how Dorgan's deposition testimony – as opposed to his trial testimony and other trial evidence – influenced the jury's decision to find in favor of Nation regarding Nation's breach of contract

claim. However, it certainly cannot be said that the jury's possession of Dorgan's deposition – a deposition where Dorgan vehemently maintained none of his salespeople were entitled to be compensated at *any rate* – caused the jury to *ignore* Dorgan's one sentence of trial testimony that "each agent [was compensated] at a different *rate*." (Emphasis added.) After all, the jury determined Harold was indeed entitled to be compensated at a *rate* of 70.5%. If any error resulted from the trial court's decision to admit Dorgan's deposition into evidence and allow the jury to review it during deliberations, the error had no discernable impact upon how the jury resolved the breach of contract claim, and it does not warrant reversal. *See* CR 61.01.

**2. Admitting the report of Nation's expert witness into evidence and then permitting the jury to have the report with them during deliberations was at most harmless error**.

Over Dorgan's objection, the trial court admitted into evidence the January 23, 2023 report of Debra Holloway Ison, the expert Nation hired to, in the words of Ison's report, "evaluate the enforcement of the broker-salesman contract executed between Harold and Dorgan." Her report's ultimate conclusion was that "Harold Nation is owed his customary division of the commission paid on the sale of the Tobacco Road Farm, Mt. Eden Road, Shelbyville, Kentucky, in the amount of 70.5%." The report's written bases for that conclusion were as follows:

> On or about May 5, 2008, Harold Nation became a
> real estate agent for Century 21 Abbot Realty. Dorgan,

as broker for Abbot Realty, entered into a contract with Nation entitled Broker-Salesman Contract. The Broker-Salesman Contract required Nation to charge "usual and customary commissions" for his services and required Dorgan to distribute the agent's division of earned commissions as soon as practicable after collection of such commissions from the party or parties for whom the services may have been performed. Dorgan and Nation operated under this agreement from 2008 until Nation's death on February 15, 2016. A review of the listings handled by Nation during his tenure at Abbot Realty confirm that from 2008 until 2013 Nation was paid 69% of the gross commission 23 out of 27 times. The four times he was not paid 69% he was paid 73.7%, 54.7%, 70.8% and 92%. From December of 2013 through the end of 2015, Nation was paid 70.5% 15 out of 21 times. The remaining six times he was paid 71.9%, 71.2%, 72.29%, 71.64%, 70.9% and 71.6%. At no time was Nation not paid a division of commissions earned for his services as an agent of Abbot Realty.

On or around October 12, 2015, Nation secured the listing contract for the Tobacco Road Farm on Mt. Eden Road in Shelbyville, Kentucky. Pursuant to the terms of the listing contract, the seller, agreed to pay a commission of 5% of the sales price, at the time of closing. The listing contract further provided that the total commission was earned upon acceptance of the offer.

Harold Nation found the buyer for the property and on October 22, 2015[,] an offer was accepted for the sale of the Tobacco Road Farm in the amount of $1,300,000. The commission was paid to Abbot Realty at the closing in the amount of $65,000 on March 29, 2016. Mr. Nation passed away on February 15, 2016. Abbot Realty has failed to distribute Mr. Nation's division of the commission as required under the Broker-Salesman Contract between Dorgan and Nation.

In reviewing the 2011-2016 YTD Sold (Property) Totals by Agent forms and the 2011 – 2016 Gross & Paid Commissions Forms, my research shows that the other agents at Abbot Realty were consistently paid a particular percentage on the commission on their transactions and periodically the agents received an increase in percentage. This is consistent with other agencies that reward agents for longevity or business that the agent may be bringing in. In my opinion, the agents had a reasonable expectation that they would receive a particular percentage of the commissions earned. I did not see anything in the research provided to me that would support a theory that the agents had no expectation to be paid a particular rate or that the rate was subject to the discretion of Dorgan.

In my opinion, Nation is owed a division of the gross commission received for the sale in the amount of 70.5% or $45,825.00. The history and customary practices of the parties should govern this matter. Though there is no specific term that sets forth the agent's division of the commission, the previous dealings of the parties reveal that Nation had an expectation to be paid a minimum of 70.5%. Nation secured the sales contract between the seller and buyer, and from that contract the commission was earned. Nation is therefore due his division pursuant to the Broker Salesman Contract after collection of the commission, which occurred at the closing on March 29, 2016. Any acts of Dorgan to finalize the deal, including but not limited to attending the closing, or escorting the appraiser to the property did not negate Nation's right to receive his division of the earned commission. Brokers frequently attend closings or perform other services when an agent is unavailable. These acts are common courtesy, and part of the services rendered by the Broker for his portion of the earned commission.

Ison Expert Report (Plaintiff's Exhibit 15) at 3-4.

As stated, our analysis is limited to whether the admission of this document caused something more than harmless error in the context of Nation's breach of contract claim against Dorgan. In that vein, Dorgan's argument is as follows:

> The admission of the expert report on its own was erroneous and harmful, but its impact was compounded by the erroneous and harmful admission of the deposition transcript. Ison's report sears the first impression; it left the jury with the improper conclusion that it was an unequivocal fact that Nation was owed 70.5% of the commission for the transaction in dispute and that Dorgan lied in saying anything otherwise.

Dorgan's Br. at 20.

Under the circumstances of this case, we disagree. First, as we have previously set forth at length, the admission of Dorgan's deposition transcript was at most harmless error relative to Nation's breach of contract claim.

Second, even if Ison's opinion set forth in her report that Nation was owed 70.5% of the commission for the transaction in dispute was legally improper, it was: (1) consistent with Dorgan's own trial testimony that Harold had a set rate that was based upon his level of experience, that he was compensating Harold at a rate equivalent to roughly 69% of commissions received from his sales pre-2013, and that more recently in 2015, Harold was compensated at a rate of roughly 70%; (2) consistent with the course of dealing evidence presented at trial, which indicated that in each of the sales Harold made in 2015, Harold received

compensation equivalent to a range between 70.5 percent and 72 percent of the gross commissions paid; and (3) consistent with Dorgan's continued inability to provide any examples supporting the existence of a course of dealing wherein he would lower the expected rate of his salespersons' compensation based upon their "participation." It was, in a word, cumulative.

Third, whether the jury believed Dorgan "lied" by saying Nation was owed anything other than 70.5% of the commission is irrelevant to whether Dorgan breached his contract with Harold. This is another example of harmless error. *See* CR 61.01.

**3. The trial court's decision to exempt Nation's expert witness from the requirements of sequestration was at most harmless error**.

Nation's expert, Ison, was permitted to listen to Dorgan's trial testimony. When Ison testified afterward, she then discussed part of what she had heard in conjunction with the expert opinion she rendered. Dorgan argues the trial court erred in doing so. The specifics of his argument are as follows:

> Ison was permitted to listen to hours of Dorgan's testimony which, in fact, influenced her testimony. She testifies, "Well, the deposition, as I stated before, was very clear on it was determined that each and every case when they brought the closing statement in. Here, when I listened to him, I noticed he kept saying 'well it was case-by-case basis with each agent. Each agent was different' So to me, that was a little confusing. Didn't match."

However, Dorgan's statement that commissions differ on a case-by-case basis with each agent was verbatim what he said during his deposition: "Each agent is on an agent-by-agent basis." Yet, Ison was influenced enough by Dorgan's testimony to exceed her scope as an expert and incorrectly alert the jury to this so-called discrepancy. Dorgan's spoken testimony was not only consistent with his deposition but was also corroborated by the commission history. Ison appears to have been keenly listening to Dorgan's testimony in anticipation of a discrepancy. Otherwise, Appellants see no reason to misstate Dorgan's testimony and prejudice Appellants.

Ultimately, Ison's misstatement shows that she was influenced enough by Dorgan's testimony to compel her to improperly represent his consistent statements as lies and mislead the jury. Permitting Appellee's expert to remain in the courtroom was erroneous, unsupported by legal principles, and resulted in prejudice to the Appellants.

Dorgan's Br. at 22-23 (record citations omitted).

The root of this issue is that Ison, in Dorgan's view, falsely indicated at trial that Dorgan's deposition testimony about how he compensated his salespeople differed from his trial testimony; and that in making this "false" indication, Ison effectively painted Dorgan as untruthful. This is the sum-total of why Dorgan believes the trial court's decision not to sequester Ison resulted in more than harmless error. And as before, Dorgan relies solely upon his lone sentence of deposition testimony – *i.e.*, his statement that "Each agent is on an agent by agent basis" – to support that his deposition testimony was actually consistent with his trial testimony.

-32-

But considering what has been set forth previously, Ison made no misstatement. In his deposition, Dorgan repeatedly denied that any of his salespeople had any expectation of being paid anything until the moment he told them – after the sale closed – what they would get. At trial, by contrast, he repeatedly testified that all his salespeople expected to be paid at a set individualized rate for their sales. Absent more – and Dorgan presents nothing more – it is unnecessary to rehash more of what we have already stated on this subject. This, too, is another example of what was at most harmless error. *See* CR 61.01.

## II. CROSS-APPEAL NO. 2024-CA-1438-MR

Nation presents only one issue in his cross-appeal. He contends the trial court erred by refusing to grant him prejudgment interest. The award or denial of prejudgment interest is reviewed for abuse of discretion, "with the understanding that a party is entitled to such interest on a liquidated damages award." *Haney v. Stykes*, 688 S.W.3d 561, 564 (Ky. App. 2023) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (internal quotation marks and citation omitted).

To review, the evidence adduced at trial supported that Nation was entitled to receive compensation equivalent to 70.5% of the overall commission

received for the Mt. Eden transaction, *i.e.*, $45,825.  Paragraph 8 of Harold's

contract with Dorgan specified that Harold was to receive his compensation "as

soon as practicable after collection of such commissions from the party or parties

for whom the services may have been performed."  It is undisputed that the

"collection of such commission" relevant to this case occurred on March 29, 2016,

after the closing; and Dorgan does not argue it would have been *impracticable* to

have paid Harold's Estate at that time.

We are left, then, with the trial court's sole reason for refusing to

grant Nation prejudgment interest on this claim: It believed that because a trial was

necessary for Nation to prove it was entitled to compensation at a rate of 70.5%,

Nation's claim against Dorgan was not "liquidated" and, therefore, prejudgment

interest was unwarranted.

The trial court abused its discretion.  To explain why this is so, we

borrow from and incorporate the following language of *Friction Materials Co.,*

*Inc. v. Stinson*, 833 S.W.2d 388, 392 (Ky. App. 1992):

> The trial court determined that [Nation] was entitled to
> the commissions, and thus [Nation] was entitled to them
> when they were earned on the sales, not merely when
> [Nation] received a judgment in [Nation's] favor.  The
> question is not so much whether a claim is liquidated or
> unliquidated, but whether "justice and equity demand an
> allowance of interest to the injured party. . . .  Where
> under a contract a debt is due at a certain time, both
> reason and authority say that it carries interest from that
> time."  *Dalton v. Mullins*, Ky., 293 S.W.2d 470, 477

(1956). *See also Finucane v. Prichard*, Ky. App., 811 S.W.2d 348 (1991); *Borden v. Martin*, Ky. App., 765 S.W.2d 34 (1989). [Nation] was due [the] commissions in [2016], and payment was long delayed. We believe fairness dictates the additional compensation.

This is a breach of contract case, and although the amount claimed was vigorously disputed, the amount was readily ascertainable. Interest should follow as a matter of course for what in substance is an unpaid debt. The Restatement (Second) of Contracts § 354 provides:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Whether this case is factually a subsection (1) or (2) claim, we conclude that prejudgment interest should be awarded.

Accordingly, with respect to Cross-Appeal No. 2024-CA-1438-MR, we reverse.

### III. CONCLUSION

Consistent with the foregoing, regarding the January 5, 2024 judgment of the Shelby Circuit Court, we AFFIRM IN PART, REVERSE IN

PART, and REMAND regarding Appeal No. 2024-CA-1424-MR, and REVERSE

Cross-Appeal No. 2024-CA-1438-MR.


ALL CONCUR.


BRIEFS FOR
APPELLANTS/CROSS-
APPELLEES:

Jason C. Vaughn
Louisville, Kentucky

BRIEFS FOR APPELLEE/CROSS-
APPELLANT:

Katherine H. Whitten
C. Gilmore Dutton
Shelbyville, Kentucky